108 T.C. No. 25


UNITED STATES TAX COURT


ROBERT D. BOOTH AND JANICE BOOTH, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  2544-94, 2545-94,        Filed June 17, 1997.
             2546-94, 5754-94,
             5755-94, 5893-94,
             9229-94, 9230-94.


        Secs. 419 and 419A, I.R.C., as enacted by the
Deficit Reduction Act of 1984, Pub. L. 98-369,
secs. 511(a), 512(a), 98 Stat. 494, 854, 862, limit an
employer's deductions for contributions made to a
welfare benefits fund for employees.  These limitations
do not apply to a welfare benefits fund that is part of
a "10 or more employer plan" described in sec.
419A(f)(6), I.R.C.  Under the Prime Plan, in which Ps

---

[1] Cases of the following petitioners are consolidated
herewith:  N.L. Booth & Son, Inc., docket No. 2545-94; John N.
Booth & Debra Booth, docket No. 2546-94; Young & Young, Ltd.,
docket No. 5754-94; Howard S. Young & Elaine P. Young, docket
No. 5755-94; Bruce E. Traegde & Patricia Traegde, docket No.
5893-94; Billy J. Johnson & Ruth Johnson, docket No. 9229-94; and
Johnson Systems, Inc., docket No. 9230-94.

participated, each participating employer made a one-time, nonrevertible contribution to a single trust, equal to the amount necessary to fund the dismissal wage and death benefits of its qualifying employees. The trust segregated each contribution into a separate account for payment of benefits to only the contributing employer's qualifying employees. If an employer's account did not have enough assets to pay a promised benefit, the trustee could supplement the account's assets with assets from a "suspense account" that was funded primarily by actuarial gains and amounts forfeited from the employers' accounts in certain enumerated situations. Each employer selected options under the Prime Plan, including participation and vesting requirements. Except through the suspense account, an employee had no right to receive benefits from other than his or her employer's account.

Held: The Prime Plan is a "welfare benefit plan" within the meaning of sec. 419, I.R.C.

Held, further: The Prime Plan is not within the scope of sec. 419A(f)(6), I.R.C., because it is an aggregation of separate plans each having an experience-rating arrangement with the related employer.

Held, further: None of the corporate Ps are liable for the accuracy-related penalties determined by R.

Charles A. Pulaski, Jr., Janet E. Barton, and Tim A. Tarter, for petitioners.

Katherine H. Ankeny, Anne W. Durning, and Randall P. Andreozzi, for respondent.

LARO, Judge: The docketed cases, consolidated for purposes of trial, briefing, and opinion, consist of four groups of test cases selected by the parties to resolve their disputes

concerning the "Prime Financial Benefits Trust Multiple Employer Welfare Benefit Plan and Trust".[2] (We hereinafter refer to this "plan" as the Prime Plan and the trust as the Trust.[3]) Each of these four groups consists of a closely held corporation and one or more of its owner/employees. In regard to each group, the Commissioner of Internal Revenue (the Commissioner or respondent) determined that the corporation could not deduct the amounts that it reported as contributions to the Trust and that the individual(s) had income to the extent that the contributions benefited him or her (or them). Each petitioner petitioned the Court to redetermine the Commissioner's determination of the resulting deficiencies in Federal income tax, penalties, and, in one case, an addition to tax. Respondent's notices of deficiency listed the following deficiencies, addition to tax, and penalties:[4]

---

[2] We have obtained this name from the underlying trust agreement, as originally drafted and as later amended on the first two occasions. The third amended version of the trust agreement used the name "Prime Financial Benefits Multiple Employer Welfare Benefit Plan and Trust". The fourth and fifth amended versions used the name "Prime Financial Multiple Employer Welfare Benefit Plan and Trust". Our use of the original name refers to all of these versions.

[3] Although we use the word "plan" in the singular to refer to the Prime Plan, we do not mean to suggest that the Prime Plan is a single plan. As discussed below, we conclude it is not. We use the word "plan" merely for clarity and convenience.

[4] All of the years refer to the calendar year, except: (1) N.L. Booth's 1989 and 1990 years refer to its taxable years ended July 31, 1990 and 1991, respectively, and (2) Systems' 1990
(continued...)

Robert D. Booth & Janice Booth (R&J Booth), docket No. 2544-94

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------|
| 1990 | $15,180   | ---                            | $3,036               |
| 1991 | 8,920     | ---                            | 1,784                |

N.L. Booth & Son, Inc. (N.L. Booth), docket No. 2545-94

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------|
| 1989 | $34,000   | ---                            | $6,800               |
| 1990 | 21,883    | ---                            | 4,377                |

John N. Booth & Debra Booth (J&D Booth), docket No. 2546-94

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------|
| 1990 | $17,820   | ---                            | $3,564               |
| 1991 | 10,263    | ---                            | 2,053                |

Young & Young, Ltd.(Young & Young), docket No. 5754-94

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------|
| 1989 | $12,744   | $637                           | $2,549               |

Howard S. Young & Elaine P. Young (the Youngs), docket No. 5755-94

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------|
| 1989 | $14,008   | ---                            | $2,802               |

Bruce E. Traegde & Patricia Traegde (the Traegdes), docket No. 5893-94

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------|
| 1989 | $14,008   | ---                            | $2,802               |

---

[4](...continued)
year refers to its taxable year ended Sept. 30, 1991.

Billy J. Johnson & Ruth Johnson (the Johnsons),
docket No. 9229-94

|       |            | Addition to Tax<br>Sec. | Penalty<br>Sec. |
| Year  | Deficiency | 6651(a)(1)  | 6662(a)  |
| 1990  | $83,972    | ---         | $16,794  |

Johnson Systems, Inc. (Systems), docket No. 9230-94

|       |            | Addition to Tax<br>Sec. | Penalty<br>Sec. |
| Year  | Deficiency | 6651(a)(1)  | 6662(a)  |
| 1990  | $108,675   | ---         | $21,735  |

We decide the following issues:

1.  Whether the Prime Plan is a welfare benefit plan or a plan deferring the receipt of compensation.  We hold it is a welfare benefit plan.[5]

2.  Whether the Prime Plan is a 10 or more employer plan described in section 419A(f)(6).  We hold it is not.[6]

---

[5] In light of a concession by respondent that amounts attributable to contributions to the Prime Plan are not includable in the gross income of the individual petitioners under sec. 83 if the plan is determined to be a welfare benefit plan, our holding on this issue makes it unnecessary to decide certain other issues in dispute; namely:  (1) Whether the Trust maintains separate accounts for each employee under sec. 404(a)(5), (2) whether the employees' rights are subject to a substantial risk of forfeiture under sec. 83, (3) whether the Traegdes extended the period of limitation for assessment of tax on income recognizable under sec. 83, and (4) whether the petitioning individuals are liable for penalties under sec. 6662(a).  We express no opinion on these issues.

[6] Our holding on this issue moots another issue in dispute; namely, whether contributions to the Prime Plan are current or capital expenditures.  We express no opinion on this issue.

3. Whether the corporate petitioners are liable for the penalties determined by respondent.[7] We hold they are not.

Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the nearest dollar.

FINDINGS OF FACT

I. Background

A. Prime Financial Partners, L.P. (Prime)

Prime is a master limited partnership that was traded on the American Stock Exchange during most of the relevant years. Prime was formed on April 16, 1987, under the laws of the State of Delaware, to acquire the financial services and real estate activities of a group of Prime's affiliated entities. Prime's general partner is Prime Partners Limited Partnership (Limited), an Arizona limited partnership, whose general partner is Prime Financial Partners, Inc. (Financial), an Arizona corporation. On December 31, 1988, the outstanding stock of Financial and the limited partnership units of Limited were held by Thomas G. Cummings, Jerry P. Franks, Anthony L. Tominac, Marvin D. Brody, and Donald A. Waldman. Joel Boyarsky and a corporation joined

_____

[7] With respect to the addition to tax under sec. 6651(a)(1), the parties stipulated that Young & Young filed its 1989 tax return untimely. Given the additional fact that in petitioners' brief they do not challenge respondent's determination of this addition to tax, we sustain respondent's determination without further discussion. Rule 142(a).

this list of owners on December 31, 1989, as did William G. Stalnaker on December 31, 1990. Mr. Tominac and the corporation terminated their ownership interests in both entities during 1990, and Messrs. Franks and Stalnaker terminated their ownership interests in the entities during 1991. On December 31, 1991, the outstanding stock of Financial and the limited partnership units of Limited were held by Messrs. Cummings, Brody, Waldman, and Boyarsky.

During the relevant years, Prime was an investment banking and financial services firm that earned revenues mostly by investing and placing money. Prime also earned revenues from commissions and administrative services generated by the Prime Plan. Prime researched, developed, and began marketing the Prime Plan in 1988. The Prime Plan provided death benefits and dismissal wage benefits (DWB's) to qualifying employees of participating employers.

On November 29, 1991, Prime filed for protection under Chapter 11 of the U.S. Bankruptcy Code.

B. Development of the Prime Plan

Mr. Brody developed the concept of the Prime Plan in 1988 in response to 1984, 1986, and 1987 tax legislation that limited the tax benefits a small business owner derived from a pension plan. Mr. Brody expected that the Prime Plan would provide meaningful tax deferral to small businesses with few employees. The Prime Plan purported to enable business owners to make tax deductible

contributions for employee benefits, while allowing them to accumulate wealth through the appreciation of assets purchased by the plan with their contributions. The Prime Plan had some similarities to a defined benefit pension plan, but the Prime Plan had fewer limitations on funding, benefits, and accessibility to funds.

Prime marketed the Prime Plan primarily to highly compensated small business owners with five to six employees. These business owners could expect to receive the following benefits from the Prime Plan, as the plan was advertised to them:

1. The employer would currently deduct a one-time contribution that it made to the Prime Plan to fund DWB's and death benefits, and the contribution would not be taxable to the employer's employees until received as benefits;

2. The employer could contribute to pension plans, as well as to the Prime Plan, but, in the case of the Prime Plan, the employer would not be subject to the rules limiting contributions to pension plans;

3. Contributions to the Prime Plan would earn income tax-free because the Trust, although not a tax-exempt entity, would invest each employer's contributions in life insurance and municipal bonds;

4. The employee/owners could reap personally most of the benefits offered by the Prime Plan by basing an employee's receipt of benefits on compensation and by using vesting

schedules to limit the benefits payable to employees other than the owners themselves;

5. Trust assets would be insulated from creditors;

6. Death benefits would not be subject to income tax or, with minimal planning, estate tax.

As of December 31, 1994, approximately 800 employers had participated in the Prime Plan. On that date, approximately 625 of these employers continued to participate in the Prime Plan.

## C. David Weiss

Mr. Weiss is an attorney who was employed during the relevant years by the law firms of Streich Lang and Snell & Wilmer. In early 1988, Prime contacted Mr. Weiss to help create a welfare benefit plan subject to section 419A(f)(6) and to draft a tax opinion that would be used to market the plan nationwide. Mr. Weiss initially refused, believing there was insufficient guidance on section 419A(f)(6) to allow him to create such a plan. Mr. Weiss later agreed to do so. Mr. Weiss was a principal architect of the Prime Plan and the Trust, and he wrote a series of tax opinion letters related thereto. These letters included opinions dated June 2, 1988, July 25, 1988, April 12, 1989, June 30, 1990, October 1, 1991, and April 1, 1993.

## D. Dr. William L. Raby

Dr. Raby is an accountant with a national reputation in areas related to the Prime Plan and the Trust. At the behest of

Mr. Weiss, Streich Lang engaged Dr. Raby from February 1988 to the beginning of 1990, to assist Mr. Weiss in forming the desired plan and to express a concurring opinion on Mr. Weiss' tax opinions related thereto. Prime informed Dr. Raby that it wanted to develop a plan that offered a front-end reduction of taxes for small employers and a deferral of income for their employees. Dr. Raby and Mr. Weiss advised Prime that the plan needed an element of risk-shifting to qualify for the desired benefits, and that a "suspense account" could be used to accomplish the required shifting of risk. Dr. Raby and Mr. Weiss later presented Prime with different provisions for the Prime Plan, some of which Prime found unacceptable for marketability purposes. Dr. Raby and Mr. Weiss redrafted the unacceptable provisions, and Prime found the redrafted provisions more to their liking.

Dr. Raby wrote an opinion concurring with Mr. Weiss' tax opinion dated June 2, 1988, and Dr. Raby concurred with Mr. Weiss' opinion dated April 12, 1989. Dr. Raby's concurrences were based on his understanding of the tax law including the "possible purposes" of section 419A(f)(6). Dr. Raby's concurrences, as well as Mr. Weiss' opinions that related thereto, did not address any version of the Prime Plan that is at issue herein; they discussed a hypothetical plan that evolved into the instant versions. Dr. Raby's name was used to promote versions of the Prime Plan that were marketed to the public.

At Mr. Weiss' request, Dr. Raby performed services in May and June 1993, in connection with respondent's consideration of issues flowing from the Prime Plan. Dr. Raby's fees were paid from the suspense account (the Suspense Account) that was part of the Trust. The Suspense Account served primarily as the depository for amounts forfeited by the employers and employee groups connected to the Prime Plan.

E.  The Trust

The Trust was a separate, taxable entity apart from Prime and its affiliates. The Trust owned all of its assets, and it was supervised by an independent trustee. The Trust's assets consisted of the money and other property contributed by the participating employers, and any earnings (or less any losses) thereon, less payments made by the trustee.

The Trust's first trustee was Northern Trust Bank of Arizona, N.A. (Northern). Northern was succeeded by Security Pacific Bank Arizona (Security Pacific) on or about June 30, 1990. Firstar Metropolitan Bank & Trust (Firstar) succeeded Security Pacific effective January 2, 1992. Firstar's trustee fees included an asset management fee of 1 percent of the market value up to $2 million per account, with 0.8 percent of the market value on the balance, plus a $15 per item transaction charge.

F.  The Administrator of the Prime Plan

The Prime Plan was overseen by an administrator.  Improved
Funding Techniques, Inc. (IFTI), was the Prime Plan's first
administrator.  On October 24, 1990, Financial's board of
directors approved a letter of intent with IFTI under which IFTI
would assume all plan administration together with related
overhead and expenses in return for existing and projected
administration fees.  Prime entered into an administrative
services agreement with IFTI in July 1991.  In consideration for
providing administrative services to the Prime Plan, IFTI billed
participating employers directly in accordance with the following
fee schedule:

```
New plan installation:                  $250
Annual service costs
      First 5 participants:             1050
      6 to 10 participants:             1450
      11 & over:                        1650 + $20 per
                                                participant
      Trustee's transaction fees:         15 per transaction
Individual benefit certification:
      Vested participants:                50
      Non-vested participants:            35
Plan amendments:                         250
Plan terminations:                       650 + $75 per
                                                participant
Revised plan valuations:                 750
Special projects & consulting:         150 per hour junior
                                       250 per hour senior
```

Under the Agreement with IFTI, Prime received a percentage of
profits equal to 10 percent of IFTI's fees for administration of
each plan where the annual fees (net of actuarial costs) exceeded
$1,000 per plan and 20 percent of the fees for administration of

each plan where the fees (net of actuarial costs) exceeded $1,500.

In 1992, Prime moved the bankruptcy court to terminate its agreement with IFTI and to subcontract the administration services to William M. Mercer, Inc.

II. The Trust Agreements

A. Overview

The Prime Plan and the Trust were established and operated pursuant to the Prime Plan and Trust Agreement, effective August 31, 1988, as subsequently amended and restated by various versions of the agreement dated December 31, 1988, December 21, 1989, June 30, 1990, January 2, 1992, and November 1, 1993. (The Prime Plan and Trust Agreement and each of these amended versions are collectively referred to as the Trust Agreement and separately referred to by the corresponding date.) Most of the amendments were made to the language originally used in the August 31, 1988, Trust Agreement in order to enhance the marketability of the Prime Plan by increasing an employer's control over its contributions (and income or loss thereon). Other amendments were made to comply with changes in the law.

Employers became participants in the Prime Plan by completing an agreement (Adoption Agreement) that enumerated the key specifications of the plan and allowed each employer to tailor the plan to its employees by selecting various options that would apply to its employees. An employer could change the options that applied to its employees, and modify the Adoption

Agreement in any other regard (e.g., to increase DWB's, death benefits, or both), with the permission of Prime and the trustee.

An employer's plan year was the 12-month period that was set forth in the Adoption Agreement, and the employer listed in its agreement the date that the Prime Plan became effective with respect to its employees.  Once an employer executed an Adoption Agreement, the employer was bound to make a one-time contribution to the Trust, equal to the amount determined by the Prime Plan's actuaries to be sufficient to fund the employer's employees' vested DWB's and level of death benefits selected by the employer in the Adoption Agreement, as well as to pay miscellaneous charges on the transaction.[8]  The employer's initial contribution for DWB's was ascertained through actuarial assumptions developed by the Prime Plan's actuaries.  The actuaries generally employed the following assumptions prior to 1991:

---

[8] The Prime Plan's initial actuary was Laventhol & Horwath. Deloitte & Touche replaced Laventhol & Horwath as the Prime Plan's actuary in 1990.

```
Interest:        7% per annum, compounded annually
Salary scale:  Average annual salary increases of 7%
Mortality:
 Pre-severance forfeiture age:      None
 Post-severance forfeiture age:     Assumed rates of
                                    mortality are based on
                                    the Society of Actuaries
                                    1951 Group Annuity
                                    Mortality Table

Terminations:  Each employee was assumed to terminate before
               reaching the forfeiture age
```

The Trust used each employer's contributions to purchase insurance products to fund the DWB's and death benefits promised under the Prime Plan.  The employer designated in its Adoption Agreement the insurance company from which the insurance products for its employees were to be purchased, as well as the type and amount of these products.  The employer could designate in its Adoption Agreement vesting periods and percentages, which determined the amount of DWB's that would be paid to its employees.  The employer could designate in its Adoption Agreement its employees' "Year of Participation" and "Year of Service", as those terms were defined in the Trust Agreement.

B.  The August 31, 1988, Trust Agreement

1.  Overview

Prime and Northern Trust entered into the August 31, 1988, Trust Agreement, "establish[ing] a Multiple Employer Welfare Benefit Fund and Trust for the exclusive benefit of the participating Employers, their Employees, and in the case of life benefits, their Beneficiaries".  Under this agreement, each

participating employer had its own "Employee Group" that consisted of its employees (the Covered Employees) who met the minimum age and service requirements set forth by the employer in the Adoption Agreement.

The Trust Agreement designated each participating employer as a "Plan Administrator".  Generally, each Plan Administrator exercised all discretionary and other authority to control and manage the operation and administration of the Prime Plan.  Under the Trust Agreement, each Plan Administrator delegated to Prime most of its duties and responsibilities with respect to the Prime Plan, including:  (1) Applying rules determining eligibility, (2) calculating service and compensation credits, (3) preparing employee communication material, benefit reports, and reports required by governmental agencies, (4) calculating benefits, (5) advising employees on their rights and options, (6) applying contributions, (7) processing claims, (8) recommending decisions on the Trust's administration and the maintenance of accounts, and (9) maintaining an account for each Covered Employee.[9]  Prime received a fee for performing these services.

---

[9] The Trust Agreement generally required the maintenance of separate accounts for each Covered Employee to assure each participating employer that any contributions that it made to the Prime Plan were segregated and considered assets of its Employee Group.

2.  DWB's

A Covered Employee generally received a DWB upon termination of his or her employment for a reason other than "cause".  The amount of the DWB, which was set forth by the employer in the Adoption Agreement, was based on a percentage of the Covered Employee's compensation in the calendar year immediately preceding termination as well as his or her years of service at the time of termination.  In no case could a DWB exceed two times compensation during the immediately preceding calendar year, and a DWB could not be greater than the amount shown in the vesting schedule set forth by the employer in the Adoption Agreement.  If an employee had severed his or her employment when the employer made the initial contribution, the employee's DWB generally equaled the amount shown as his or her "Vested Severance Benefit" in that year's annual report.

Prime had the sole discretion to pay the DWB in a lump sum or to pay the DWB in monthly installments not to exceed 24 months after the Covered Employee's termination date.  The payment of DWB's was secured by the insurance company that issued insurance policies on the life of each Covered Employee.

A Covered Employee's DWB generally was forfeited to the Suspense Account if he or she:  (1) Was discharged for "cause", (2) terminated employment after attaining a stated age, or (3) died while employed.  Under the August 31, 1988, Agreement, employment meant "working as an employee, partner or proprietor

in the same occupation or profession", and a discharge for "cause" occurred when the discharge resulted from "a proven dishonest or criminal act committed in the course of the Employee's employment with the Employer". The same agreement defined: (1) The stated age as the "Forfeiture Age", which was defined as "an age which is three years prior to a Covered Employee's Normal Retirement Date", (2) the "Normal Retirement Date" as a date set forth by the employer in the Adoption Agreement, and (3) a "Termination of Employment" as "the earliest of the date on which an Employee become [sic] Totally Disabled, resigns or is discharged without Cause." The Normal Retirement Age generally was set forth by the employers as (1) the later of age 65 or completion of 10 years of participation in the Prime Plan, or (2) if the participating employer had a qualified plan, the definition given that term under the qualified plan. DWB's that were forfeited due to death or the attainment of the Forfeiture Age were segregated into the Suspense Account to be used to increase that employer's Covered Employees' DWB's or death benefits, to provide new welfare benefits, to provide benefits for replacement employees, or to distribute to the Covered Employees if and when the employer withdrew from the Prime Plan.

Contributions made to fund DWB's were invested in flexible premium adjustable life policies (universal life policies) or, in the case of a Covered Employee who was determined to be

uninsurable, in a tax-exempt money market fund.  Prime maintained commission-sharing arrangements with the insurance companies that wrote these insurance policies.  Prime usually earned a commission equal to 22 percent of the amount paid for life insurance and 1.2 percent of the amount paid to fund DWB's. Employers typically contributed $50,000 to the Trust.  Generally, $6,000 of this amount was used to purchase life insurance and the balance ($44,000) to fund DWB's.

### 3.  Death Benefits

If a Covered Employee died while employed, a death benefit became payable to his or her beneficiary in the amount set forth by the employer in the Adoption Agreement.  This amount was generally stated as a percentage of the Covered Employee's compensation or, if higher, a set minimum amount.  For a Covered Employee who was other than a standard underwriting risk, the death benefit could be reduced or eliminated, depending on the provisions of the employer's Adoption Agreement.

Death benefits were typically funded through universal life policies.  Under such a policy, the premiums in excess of the amount necessary to fund current mortality and administrative expenses are typically invested by the carrier at a fixed rate of return.  This rate of return may vary over time, although carriers generally guarantee a specified minimum return.

The amounts paid by the Trust for the universal life policies were generally separated into two amounts:  (1) The

target premium, which was the cost of the life insurance, and (2) the excess premium, which was an amount placed into a side fund for payment of DWB's. In the cases where second and subsequent year contributions were made by an employer, the contributions were usually made to pay a renewal premium on the life insurance or to increase the side fund. Contributions were also sometimes made in years subsequent to the first year to purchase additional insurance for newly eligible employees or to increase the amount of insurance for employees with salary changes so that the plan remained within the terms of the Adoption Agreement and the provisions of the Code that were believed related thereto. If the employer failed to make the required contributions to keep the policy in force, Prime was required to make these contributions from assets allocable to the employer's Employee Group.

Universal life policies offer a policy owner certain options regarding the cash surrender value of the policy. Under one option, the policy's cash surrender value is included in the face amount paid to the beneficiary upon the insured's death. Under a second option, the carrier pays both the face amount and cash surrender value to the beneficiary upon the insured's death. Under the Trust Agreement, the Trust had to elect the second option for each universal life policy that it acquired. When the insured died, the carrier paid the beneficiary the policy's face amount, thus discharging the Prime Plan's obligation to pay the

deceased employee's vested death benefit, and the carrier paid the Trust the cash surrender value associated with the policy. Under the universal life policies acquired by the Trust, the Trust could obtain a policy's cash surrender value before the insured died by surrendering the policy. The amount received was usually reduced by a surrender charge during the first several years of the policy.

A death benefit was not payable if a Covered Employee died on or after the date he or she terminated employment or was discharged for cause. In the case of an owner/employee, a death benefit was not payable when he or she terminated his or her employment. A death benefit also was not payable when the owner/employee continued to work but reached the date that was the later of age 70-1/2 or the 10th anniversary of his or her participation in the plan.

Upon termination of employment, a Covered Employee could, with Prime's approval, elect to convert to individual coverage or purchase his or her life insurance policy for its cash surrender value. Absent such an election, the policy was surrendered or transferred to the life of another Covered Employee. The forfeited proceeds from the sale or surrender of life insurance were segregated into the Suspense Account and used to increase the employer's Covered Employee's DWB's or death benefits, to provide new welfare benefits, to provide benefits for replacement employees, or to distribute to the Covered Employees if and when

the employer withdrew from the Prime Plan. If an employee severed employment without a vested DWB, the cash surrender value of his or her life insurance policy, if surrendered, was added to another policy in the Employee Group.

### 4. Obligations and Liabilities

An employer that participated in the Prime Plan was required to make an actuarially determined contribution in any year in which one of its employees became eligible for a DWB or the employer elected to increase the amount payable to its Covered Employees under the Adoption Agreement. An employer had no obligation to make additional contributions to provide for the payment of DWB's if there were insufficient assets in the Trust allocable to its Employee Group. An employee's right to a DWB extended only to his or her allocable share of Employee Group assets. If there were insufficient assets allocable to an Employee Group to pay a Covered Employee's DWB, procedures were set forth to pay a smaller benefit commensurate with the available assets.

The employer relinquished all rights to the contributions made to the Trust, and no amounts could revert to the employer or be used for purposes other than the benefit of the Covered Employees or for the payment of taxes and expenses of the Trust's administration. Neither the employer, Plan Administrator, Prime, or the trustee had any liability to pay any benefits provided under the Plan beyond the assets in the Trust allocable to the

applicable Employee Group.  Neither the employer, Plan Administrator, Prime, or the trustee was responsible for contributions that were required for any other participating employer.

### 5. Separate Accounting

Prime was required to maintain separate accounts reflecting the share of each Employee Group and to determine the December 31 value of the insurance contracts and tax-exempt money market bond fund allocable to each Employee Group.  Prime was required to keep accurate and detailed accounts of all transactions, investments, receipts, and disbursements.  Prime was required to file a written report of this information with each employer within 60 days after each December 31st.

At the end of each plan year, the Prime Plan's actuaries were required to calculate experience gains and losses with respect to each Employee Group, whether or not any gains or losses had actually occurred.  Experience gains and losses were measured by comparing each employee's theoretical compensation to actual compensation and by comparing the expected rate of return on the assets held in the Employee Group account with the actual rate of return on these assets.  To the extent that the theoretical compensation exceeded actual compensation, or the expected rate of return exceeded the actual rate of return, an experience gain resulted and the amount of the experience gain had to be forfeited to the Suspense Account.

Neither Prime nor its actuaries ever implemented the Trust provisions requiring an annual calculation of experience gains and losses. Prime changed its method of calculating experience gains and losses effective June 30, 1990, because the unexpected number of accounts which incurred experience gains created a significant concern among the plan participants and their advisers. Prime believed that this could potentially create non-recoverable Suspense Account assets and alarm plan participants. Prime wanted to reduce the amount of experience gain subject to forfeiture and find a way to allow Suspense Account distribution on withdrawal.

6. Employer Withdrawal From the Prime Plan

Employers could withdraw from the Prime Plan at any time by submitting written notification to Prime, accompanied by documentation showing that the necessary ownership interest of the employer had approved the withdrawal. The necessary ownership interest was the percentage listed by that employer in its Adoption Agreement. If an employer failed to pay Prime's annual administrative fee, Prime had the sole discretion to force that employer to withdraw from the Prime Plan.

Upon an employer's withdrawal, assets were distributed to all living Covered Employees who were employed during the period that began 18 months before Prime's receipt of the notice. Excess assets remaining in the Trust allocable to the Employee Group after payment of all benefits and the employer's share of

the Trust's tax liability were distributed pro rata using the aggregate compensation received by each Covered Employee over the period not to exceed 5 years that was listed by the employer in the Adoption Agreement.

For an owner/employee who anticipated employment beyond the Forfeiture Age, the Trust Agreement did not prohibit that owner from withdrawing his or her company from the Prime Plan and receiving a withdrawal distribution. For an owner-employee who anticipated retiring, the Trust Agreement did not prohibit that owner from withdrawing his or her company from the Prime Plan and receiving a withdrawal distribution. Prime's actuaries assumed that no employee would forfeit benefits upon retirement, and no employee ever forfeited a DWB because he or she retired or stayed employed beyond the Forfeiture Age. Prime's actuaries assumed that no payments would come from the Suspense Account to supplement the payment of benefits from the Trust.

### 7.  Amendment and Termination of the Prime Plan

Prime retained the right to amend, modify, or delete any provision of the Trust Agreement. Prime retained the right to terminate the Prime Plan in certain circumstances, one of which was if the plan failed to satisfy section 419A(f)(6).

### 8.  The Trustee

The trustee was compensated under the terms of a written agreement that it entered into with Prime. All reasonable costs incurred by the trustee in performance of its duties were paid

from the Trust, as was the case with all taxes levied or assessed against the Trust. The trustee and insurer withheld any taxes that were required to be withheld from any payment to a Covered Employee and/or beneficiary.

C.  The December 31, 1988, Trust Agreement

Prime amended the Trust Agreement on or about December 31, 1988. In relevant part, the following amendments were made.

First, Prime deleted the requirement that forfeited DWB's and forfeited proceeds from the sale or surrender of life insurance policies be segregated into the Suspense Account to be used to provide benefits to the corresponding employer's Covered Employees. Prime replaced this requirement with a provision stating that these forfeitures would be experience gains subject to the existing provisions, except as otherwise modified by the amendments. One of these amendments required experience gains to be allocated annually to the Suspense Account and allowed Prime to direct the trustee to invest these amounts in tax exempt securities or leave the amounts in each applicable Employee Group subject to a lien.

Second, Prime was given the power to use the Suspense Account assets in any manner consistent with a purpose or objective of the Prime Plan, including supplementing the payment of DWB's to an Employee Group with insufficient assets to pay projected benefits due to experience losses suffered by that Employee Group. Another new provision provided that neither

Prime nor the Trustee had any liability to a Covered Employee for the manner in which Suspense Account assets were used or allocated among the Employee Groups.

Third, Prime removed the obligation of an employer to make an actuarially determined contribution in any subsequent year in which an employee became eligible for a DWB. Prime replaced this obligation with an obligation to do so only if the employer notified Prime that the employer intended to make such a contribution.

D.   The December 21, 1989, Trust Agreement

Prime amended the Trust Agreement a second time on or about December 21, 1989. Prime made these amendments primarily to reflect matters affecting the trustee. None of these amendments are relevant to our discussion herein.

E.   The June 30, 1990, Trust Agreement

Prime amended the Trust Agreement a third time on or about June 30, 1990. In relevant part, Prime made the following amendments.

First, Prime inserted Security Pacific as the successor trustee.

Second, Prime added a provision allowing DWB's to be funded through the purchase of a second to die life insurance policy. Another new provision allowed the funding of death benefits through the purchase of term insurance and second to die life insurance policies.

Third, Prime added a requirement that an employer had to make actuarially determined contributions in any subsequent year in which the employer notified Prime that the employer intended to make a contribution for an employee who was entitled to a greater vested percentage of his or her DWB than in the year the Adoption Agreement was executed.

Fourth, Prime expanded the Trust's existing provisions to state that the trustee would not be liable to a Covered Employee or beneficiary with respect to shortfalls in any of the benefits. The existing provisions were further expanded to provide that neither Prime nor the trustee would be liable to a Covered Employee or beneficiary as to decisions on the use of Suspense Account assets to supplement or not to supplement a DWB. Other new provisions reflected limits on the Trust's liability and stated that Prime's maintenance of separate accounts was not a separate trust fund.

Fifth, Prime replaced the term "experience gain" with the term "Asset Gains, Liability Gains and Overfunded Gains", and set forth a "measurable event" method of allocating gains to the Suspense Account. Prime defined a measurable event as: a severance, death, or attainment of Forfeiture Age of one or more Covered Employees, or the withdrawal of the Employee Group. Prime set forth another new provision that provided an objective formula under which Prime was allowed to release a portion of the Suspense Account when a measurable event occurred and an Employee

Group had insufficient assets to pay DWB's, or an Employee Group withdrew from the Trust. This formula was stated as follows:

fair market value of suspense account on valuation Date $\times$ $\dfrac{\text{theoretical actuarial liability for employee group}}{\text{theoretical actuarial liability for Trust}}$ $\times$ $\dfrac{\text{actual employer contributions}}{\text{theoretical employer contributions}}$

Prime added other provisions that defined the relevant terms in the formula and gave Prime the absolute discretion not to use the formula if using it would be inconsistent with a purpose of the Prime Plan.

Sixth, Prime added a provision that specified that a withdrawing employer's written notice must list a withdrawal date no later than 90 days after Prime received the notice. Prime added another new provision specifying that it would deliver to the employer within 60 days of Prime's receipt of the notice an accounting of the employer's account in the Prime Plan.

Seventh, Prime listed the asset allocation procedures that it would use to distribute assets to employees of a withdrawing employer.

Eighth, Prime listed the trustee's rights and duties to include: (1) The right to be reimbursed for the employment of experts that it considered necessary to carry out its obligations, (2) the right to be held harmless from and against any loss, liability, or expense incurred without gross negligence, breach of trust, or violation of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406,

88 Stat. 829, arising out of its administration of the Trust, and (3) the ability to reimburse itself, in certain circumstances, from amounts held in the Trust, starting with the Suspense Account.

### F.  The January 2, 1992, Trust Agreement

Prime amended the Trust Agreement a fourth time on or about January 2, 1992.  In relevant part, the following amendments were made.

First, Prime inserted Firstar as the successor trustee.

Second, Prime added a provision requiring forfeiture of a DWB upon actual retirement rather than upon reaching the Forfeiture Age.  Another new provision defined the term "retirement" to mean "a Covered Employee's severance from service with an Employer other than for Cause, Death or Total Disability, where such Covered Employee cannot show proof of subsequent employment or an attempt to obtain subsequent gainful employment to Prime".  Another new provision set forth the allocation of "Employer Withdrawal Gains" to the Suspense Account.

### G.  The November 1, 1993, Trust Agreement

Prime amended the Trust Agreement a fifth time on or about November 1, 1993.  In relevant part, the following amendments were made.

First, Prime added a provision stating that the amount of gains allocated to the Suspense Account at the time of a measurable event would equal the total gains multiplied by the

ratio of an employer's total contributions made to the Prime Plan as of December 31 over the total of all contributions which the employer should have made to fully fund its Employee Group's benefits. Prime also amended the measurable event formula to read as follows:

$$\text{fair market value of suspense account on valuation date} \times \frac{\text{actual employer contributions}}{\text{total employer contributions to the Trust}} \times \frac{\text{actual employer contributions}}{\text{theoretical employer contributions}}$$

Another new provision gave Prime the sole discretion not to use the measurable event formula wherever Prime concluded that the formula would give a Covered Employee a larger benefit upon an employer's withdrawal than he or she would have received as a DWB.

Second, Prime replaced the phrase "terminated his employment with the Employer on account of Retirement" with the phrase "remained in the employ of the Employee Group beyond his Forfeiture Age".

Third, Prime added a provision allowing the use of Suspense Account assets to pay all fees and costs incurred in litigating with the Commissioner issues related to the Prime Plan. Permissible fees and costs included those of attorneys, accountants, actuaries, and expert witnesses. Before this amendment, Prime had spent $215,000 from the Suspense Account to pay for legal services rendered mainly by Mr. Weiss and Mr. Brody in defense of the Commissioner's challenge of the deductibility

of employers' contributions to the Prime Plan.  Mr. Weiss had authorized the payment of these amounts.

III.  Prime's Duties in Operation of the Prime Plan

Prime implemented the provisions of each employer's account in the Prime Plan, issued annual reports and generated tax filings on each account, and dealt with insurance providers. Prime's responsibilities also included tracking money by Employee Group, reviewing advertisements and sales materials, assisting with tax audits, responding to legal issues, and assisting in interpreting the Trust's provisions.

Prime computed each Covered Employee's vested DWB by multiplying:  (1) That employee's compensation listed on his or her Form W-2 (Wage and Tax Statement) for the year before the year the employer made the contribution, by (2) the accrual percentage, by (3) the years of service (or the maximum accrual years, if applicable), by (4) the employee's vesting percentage as determined in accordance with the vesting schedule selected by the employer in the Adoption Agreement.  The accrual percentage was a "plug" in that the percentage was based on how much money the employer believed it could afford to spend for a certain benefit.

IV.  The Trust's Financial Information

A.  Overview

The Trust began accepting contributions from employers in November 1988.  As of June 30, 1992, the Trust had received $92,273,952 in contributions, broken down as follows: $15,852,213 in 1988, $29,453,541 in 1989, $25,281,057 in 1990, $14,178,375 in 1991, and $7,508,766 in 1992.

Prime never valued the Trust as a whole, and Prime never filed a Form 5500 (Annual Return/Report of Employee Benefit Plan) for the Prime Plan as a whole.  Neither the Prime Plan nor the Trust had a 1988 Form 1041 (U.S. Fiduciary Income Tax Return) filed on its behalf.  Norstar Trust Co. of Rochester, New York, filed 1989 and 1990 Forms 1041 that reported the following items of income and expense for a complex trust named "Prime Financial Benefits Trust--New York" (E.I.N. 86-0633138) (the New York Trust):

|                    | 1989      | 1990      |
|--------------------|-----------|-----------|
| Tax-exempt income  | $10,905   | $64,477   |
| Total income       | - 0 -     | - 0 -     |
| Fiduciary fees     | 500       | 10,623    |
| Total deductions   | - 0 -     | - 0 -     |
| Taxable income     | - 0 -     | - 0 -     |
| Total tax          | - 0 -     | - 0 -     |

Security Pacific filed 1990 through 1994 Forms 1041 that reported the following items of income and expense for the Trust, listed

on the forms as a complex trust named "Prime Financial Benefits

Trust" (E.I.N. 86-6184818):[10]

|                                     | 1990      | 1991      | 1992      | 1993      | 1994      |
|-------------------------------------|-----------|-----------|-----------|-----------|-----------|
| Interest income                     | $232,158  | $372,992  | $351,722  | $106,927  | $92,464   |
| Other income: forfeitures           | ---       | 9,453     | ---       | ---       | ---       |
| Other income: refund trustee fees   | ---       | ---       | ---       | ---       | 4,012     |
| Tax exempt income                   | 55,467    | 34,812    | 295,340   | 118,797   | 14,498    |
| Total income                        | 232,158   | 382,445   | 351,722   | 106,927   | 96,476    |
| Taxes                               | 10,306    | - 0 -     | 13,572    | - 0 -     | 7,519     |
| Fiduciary fees                      | 53,836    | 63,293    | 22,994    | - 0 -     | - 0 -     |
| Attorney, accountant                | 13,247    | 136,440   | 96,205    | 104,764   | 173,804   |
| Other deductions                    | 3,500     | - 0 -     | 16        | 1,761     | 10,547    |
| Other deductions: mgmt/admin fees   | - 0 -     | - 0 -     | 173,550   | 79,263    | 128,000   |
| Exemption                           | 100       | 100       | 100       | 100       | 100       |
| Taxable Income                      | 164,781   | 199,276   | (20,428)  | (22,898)  | (182,687) |
| Total tax                           | 46,139    | 61,017    | - 0 -     | - 0 -     | - 0 -     |

The Trust paid no benefits in 1988. From 1989 through 1994,

the Trust paid $30,420,770 in employer withdrawal benefits and

DWB's as shown below:

|                   | 1989     | 1990        | 1991        | 1992         | 1993        | 1994        | Total        |
|-------------------|----------|-------------|-------------|--------------|-------------|-------------|--------------|
| DWB's (number)    | 0        | 6           | 50          | 57           | 87          | 56          | 256          |
| Withdrawal dist.  | $468,274 | $2,292,366  | $3,848,663  | $10,732,521  | $6,227,028  | $4,117,684  | $27,686,536  |
| DWB's (amount)    | 0        | 11,985      | 682,394     | 640,125      | 727,947     | 671,783     | 2,734,234    |
| Total             | 468,274  | 2,304,351   | 4,531,057   | 11,372,646   | 6,954,975   | 4,789,467   | 30,420,770   |

### B. Suspense Account transactions

The first Suspense Account transaction was a deposit of a

$37,841 death forfeiture on December 21, 1990. The following

chart is a summary of all Suspense Account activity through

October 31, 1994:

---

[10] We are unable to determine whether the New York Trust is the same entity as the Trust. The entities have different E.I.N.'s, and the New York Trust's Forms 1041 reported that it was created on Aug. 1, 1988, while the Trust's Forms 1041 reported that it was created on Aug. 31, 1988. The 1990 Form 1041 filed for the Trust also reported that the "OLD NAME OF FIDUCIARY" was "NORTHERN TRUST BANK OF ARIZONA N.A.". Our Opinion is not affected by whether the New York Trust and the Trust are the same or different entities.

|                      | Total Out | Total In  |
|----------------------|-----------|-----------|
| Accounting fees      | $4,184    | ---       |
| Actuarial gains      | ---       | $252,977  |
| Administrative fees  | 192,000   | ---       |
| Death benefit        | 3,398     | ---       |
| Death forfeitures    | ---       | 474,839   |
| Expense allocations  | 22,939    | ---       |
| Interest earned      | ---       | 48,581    |
| Legal fees           | 387,990   | 256       |
| Miscellaneous        | 2,011     | ---       |
| Trustee fees         | 4,203     | ---       |
| Unrealized loss      | 17,035    | ---       |
| Totals               | 633,760   | 776,653   |

Mr. Weiss approved of the use of Suspense Account assets to pay legal fees, administrative fees, and trustee fees. Approximately $280,000 of the legal fees were paid to Snell & Wilmer and Streich Lang.

V.  Young & Young

A.  Overview

The Youngs are husband and wife, and they resided in Sedona, Arizona, when they petitioned the Court.  The Youngs owned 100 percent of the stock of Young & Young, a corporation providing medical care in and around Sedona, during the relevant years. Young & Young's principal place of business was in Arizona, when it petitioned the Court.

During the relevant years, Howard Young was a radiologist working out of a hospital through a partnership in which Young & Young was a 50-percent partner.  Elaine Young was a dermatologist with her own practice.  Carleen Garcia was the nurse and office manager of Elaine Young's practice.

Young & Young reported its operations for Federal income tax purposes on a calendar year, and it used the cash receipts and disbursements method on its relevant Federal income tax returns. These returns reported the following information:

|  | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|
| Total income | $440,673 | $571,125 | $672,543 | $622,323 | $639,859 |
| Compensation of officers | 164,000 | 327,000 | 450,000 | 315,000 | 367,000 |
| Salaries & wages | 86,551 | 36,600 | 42,656 | 23,247 | - 0 - |
| Pension, profit-sharing, plans | 73,462 | 77,769 | 93,556 | 160,351 | 102,506 |
| Employee benefit programs | 17,368 | 56,230 | 6,761 | 9,418 | 5,425 |
| Taxable loss | 2,444 | 12,549 | 24,327 | 20,945 | 1,875 |

Of the reported compensation, Howard Young received $111,500, $163,500, $225,000, $167,500, and $166,000 during the respective years.

The Youngs filed timely a joint 1989 Federal income tax return. On January 7, 1994, the Commissioner mailed them a notice of deficiency reflecting a determination that the Youngs' 1989 taxable income was increased by $50,030 on account of a taxable transfer of property from Young & Young under section 83. The notice also stated that the Youngs were liable for a $2,802 accuracy-related penalty under section 6662(a) because the underpayment of tax was due to negligence.

On the same day, the Commissioner mailed Young & Young a notice of deficiency reflecting a determination that its 1989 taxable income was increased by $50,030 because its contribution to the Trust was governed by subpart D.[11] Young & Young had

_____

[11] Subpart D refers to subpart D of subchapter D of chapter
(continued...)

filed its 1989 tax return on March 23, 1990, 8 days after the due date.  The notice of deficiency also stated that Young & Young was liable for:  (1) A $637 addition to tax for delinquency under section 6651(a)(1), and (2) a $2,549 accuracy-related penalty under section 6662(a) because its underpayment of income tax was due to a substantial understatement.

### B.  Young & Young's Introduction to the Prime Plan

Donald A. Waldman was the Youngs' tax adviser.  In December 1989, Mr. Waldman introduced the Youngs to the Prime Plan, advising Howard Young that the plan provided life insurance as well as tax deferral.  Howard Young viewed the Prime Plan as a "wise business investment for the company" because it provided life insurance, which he needed at that time, and because of "the tax deferment."  Howard Young relied on Mr. Waldman in choosing to participate in the Prime Plan and in reporting the tax ramifications that flowed therefrom.  Mr. Waldman was competent to give an opinion on the Prime Plan.

### C.  Young & Young's Adoption of the Prime Plan

Young & Young joined the Prime Plan by executing an Adoption Agreement dated and effective as of December 1, 1989, and by making a $50,030 contribution to the Trust approximately 16 days later.  Young & Young's $50,030 contribution was applied to the full accrual of DWB's for its Covered Employees ($42,526) and the

---

[11](...continued)
I of subtitle A of the Code.

cost of their death benefits ($7,500).  Young & Young deducted the full contribution on its 1989 tax return.

Young & Young's three employees (the Youngs and Carleen Garcia) became Covered Employees under the Prime Plan as of December 1, 1989.  On January 14, 1992, Elaine Young executed an addendum to Young & Young's Adoption Agreement electing retroactively to waive her right to participate in the Prime Plan.  In all, Young & Young executed the following Adoption Agreements during its participation in the Prime Plan:

| Date effective | 12/01/89 | 12/01/89 | 12/01/89 | 12/01/89 | 12/01/89 |
|---|---|---|---|---|---|
| DWB percentage | Not listed | Not listed | 1.55% | 1.907% | 3.814% |
| Years of service | Not listed | Not listed | 10 | 10 | 10 |
| Vesting schedule | 4/40 | 4/40 | 4/40 | 4/40 | 4/40 |
| Normal retirement age | 55 | 55 | 55 | 55 | 65 |
| Death benefit multiple | Not listed | Not listed | 2.320 | 3.330 | 3.330 |
| Date executed | 12/01/89 | 12/01/89 | 4/06/90 | 06/23/92 | 12/30/92 |

D.  Administration of Young & Young's Account in the Prime Plan

Improved Funding Techniques, Inc. (IFTI), prepared the 1989 annual report for Young & Young's account in the Prime Plan, and IFTI delivered the report to Howard Young on December 27, 1991. The report included an actuarial valuation signed by Deloitte & Touche and provided the following calculation of vested DWB's for Young & Young's Covered Employees:

| | 1988 Compensation | Accrual percentage | Years of Service | Vesting percent | Vested DWB |
|---|---|---|---|---|---|
| Howard Young | $111,500 | 3.814% | 10 | 100% | $42,526 |
| Carleen Garcia | 11,332 | 3.814 | 2 | - 0 - | - 0 - |

The 1989 report addressed only Young & Young's Employee Group, and it did not provide any information concerning the Trust as a whole.  The report used a 3.814 accrual percentage for

the DWB's which had been unstated in any of the Adoption Agreements executed by Young & Young before the report was prepared.  On December 30, 1992, Young & Young executed an Adoption Agreement allowing for the 3.814 percent accrual percentage.

Other annual reports prepared for Young & Young's account reported the following relevant information:

|  | 1989 | 1990 | 1991 |
|---|---|---|---|
| Fund value at yearend | $50,018 | $46,185 | $48,015 |
| Policy values | - 0 - | 46,005 | 48,026 |
| Surrender value | N/A | 38,026 | 40,446 |
| Additional contribution available | (4) | 1,467 | 3,866 |
| Date of report | 12/27/91 | 12/27/91 | 02/12/93 |

On March 16, 1990, Prime forwarded to Young & Young a copy of the 1989 summary plan description required by section 102 of ERISA.  The description was later restated to reflect the amendments to the Trust Agreement through January 1992.

E.  Forms 5500-C/R (Return/Report of Employee Benefit Plan)

Forms 5500-C/R filed with the Commissioner for Young & Young's account in the Prime Plan included the following information:

|  | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|
| Yearend assets | $100,018 | $38,204 | $40,435 | $43,066 | $43,256 |
| Income | 103 | 2,853 | 3,930 | 4,362 | 1,913 |
| Expenses | 114 | 14,667 | 1,699 | 1,731 | 1,723 |
| Contributions | 100,030 | - 0 - | - 0 - | - 0 - | - 0 - |

These forms also reported the payment of insurance commissions of zero, $7,793, zero, zero, and zero in the respective years from 1989 through 1993.

F.  Young & Young's Withdrawal From the Prime Plan

On August 8, 1994, Howard Young requested that an estimate be calculated for Young & Young's withdrawal from the Prime Plan.

VI.  N.L. Booth

A.  Overview

Robert and Janice Booth (R&J Booth) are husband and wife, and they resided in Scottsdale, Arizona, when they petitioned the Court.  John and Debra Booth (J&D Booth) are husband and wife, and they resided in Scottsdale, Arizona, at the time of their petition.  During the relevant years, Robert Booth was vice president and secretary of N.L. Booth, a corporation engaged in the construction business in Phoenix, Arizona, and he owned 11.1 percent of N.L. Booth's stock.  John Booth was N.L. Booth's president and treasurer, and he owned 25 percent of N.L. Booth's stock.  N.L. Booth's remaining stock was owned by Phyllis Booth, the mother of John and Robert Booth.

N.L. Booth's principal place of business was in Arizona when it petitioned the Court.  N.L. Booth reported its operations for Federal income tax purposes on a fiscal year ending July 31, and it used an accrual method on its relevant tax returns.  These returns reported the following information:

| Taxable year ended | 07/31/89 | 07/31/90 | 07/31/91 | 07/31/92 | 07/31/93 |
|---|---|---|---|---|---|
| Total income | $612,603 | $1,230,318 | $1,009,373 | $1,235,227 | $889,174 |
| Compensation of officers | 176,300 | 274,600 | 451,200 | 437,892 | 239,200 |
| Salaries & wages | 49,649 | 74,655 | 37,767 | 52,014 | 53,296 |
| Pension, profit-shar. plans | 40,000 | 8,500 | 43,261 | 152,464 | 150,696 |
| Employee benefit programs | - 0 - | 100,000 | 56,739 | - 0 - | - 0 - |
| Taxable income | 69,279 | 478,098 | 95,100 | 231,648 | 101,792 |

Of the reported compensation, Robert Booth received $92,600, $139,600, $228,000, $119,746, and $122,000 during his 1989 through 1993 taxable years, respectively, and John Booth received $85,300, $134,800, $224,800, $314,946, and $117,200 during the same respective years.

R&J Booth filed timely joint 1990 and 1991 Federal income tax returns. On November 16, 1993, the Commissioner mailed them a notice of deficiency reflecting a determination that R&J Booth's taxable income for 1990 and 1991 was increased by $46,000 and $26,100, respectively, on account of taxable transfers of property from N.L. Booth under section 83. The notice also stated that R&J Booth were liable for $3,036 and $1,784 in accuracy-related penalties under section 6662(a) for the respective years.

On the same day, the Commissioner mailed to J&D Booth a notice of deficiency reflecting her determination that J&D Booth's 1990 and 1991 taxable income was increased by $54,000 and $30,639, respectively, on account of taxable transfers of property from N.L. Booth under section 83. J&D Booth had timely filed a joint Federal income tax return for each of these years. The notice also stated that J&D Booth were liable for $3,564 and $2,053 in accuracy-related penalties under section 6662(a) for the respective years.

The Commissioner also mailed a notice of deficiency to N.L. Booth on that date, reflecting a determination that its 1989 and

1990 taxable income was increased by $100,000 and $56,739, respectively. The notice stated that N.L. Booth's contribution to the Prime Plan was governed by subpart D. The notice also stated that N.L. Booth was liable for $6,800 and $4,377 in accuracy-related penalties under section 6662(a) for the respective years because its underpayments of income tax were due to substantial understatements. N.L. Booth filed timely 1989 and 1990 tax returns.

### B. N.L. Booth's Introduction to the Prime Plan

Barclay D. Schultz was N.L. Booth's insurance agent for the Prime Plan. On July 17, 1990, Mr. Schultz contacted Prime about N.L. Booth's possible participation in the Prime Plan. Sixteen days later, Joseph P. Waters, N.L. Booth's certified public accountant, furnished N.L. Booth with computations of projected earnings from participating in the Prime Plan. Robert and John Booth (collectively, the Booths), individually and in their capacity as officers of N.L. Booth, relied upon competent and informed tax and investment advisers before joining the Prime Plan and in reporting the tax ramifications that flowed therefrom.

### C. N.L. Booth's Adoption of the Prime Plan

N.L. Booth joined the Prime Plan by executing an Adoption Agreement dated and effective as of July 31, 1990, and by contributing $25,030 to the Trust 37 days later. N.L. Booth was required to make a remaining contribution of $75,000 to the Trust

by October 15, 1990.  N.L. Booth made this contribution, without interest, on January 30, 1991.  N.L. Booth's 1989 tax return claimed a $100,000 deduction for accrued contributions owed the Trust.

N.L. Booth's 1990 tax return claimed a $56,739 deduction for accrued contributions owed the Trust.  On February 14, 1992, N.L. Booth paid Firstar Metropolitan Bank & Trust (Firstar) $55,000 of this amount; N.L. Booth never paid the remaining $1,739. Generally, the $55,000 contribution was applied as follows: (1) An increase in DWB's resulting from the change in the accrual percentage, (2) an increase in vesting, and (3) the cost of a death benefit.

In all, N.L. Booth executed the following Adoption Agreements relating to its participation in the Prime Plan:

| Date effective | 07/31/90 | 07/31/90 | 01/01/91 | 07/31/90 |
|---|---|---|---|---|
| Dismissal wage benefit percentage | 4.196 | 2.84 | 6.54 | 4.196 |
| Years of service | 10 | 10 | 10 | 10 |
| Vesting schedule | 4/40 | 4/40 | 4/40 | 4/40 |
| Normal retirement age | Same as 401(a) | Same | Same | Same |
| Death benefit multiple | 4.122 | 2.692 | 4.122 | 4.122 |
| Date executed | 07/31/90 | 07/31/90 | 07/30/91 | 10/01/91 |

D.  Administration of N.L. Booth's Account in the Prime Plan

On August 12, 1991, IFTI forwarded the 1990 annual report for N.L. Booth's account in the Prime Plan to John Booth.  The report pertained only to N.L. Booth's Employee Group.  The report included an actuarial valuation signed by Deloitte & Touche and provided the following calculations of vested DWB's:

| | 1989 Compensation | Accrual percent | Years of Service | Vesting percent | Vested DWB |
|---|---|---|---|---|---|
| John Booth | $84,900 | 4.196 | 10 | 100 | $35,624 |
| Robert Booth | 84,900 | 4.196 | 10 | 100 | 35,624 |
| Andrew Alvis | 36,900 | 4.196 | 2 | - 0 - | - 0 - |
| Thomas Geary | 37,674 | 4.196 | 4 | 40 | 2,529 |
| Trevor Naugle | 39,900 | 4.196 | 10 | 100 | 16,742 |

The report did not provide any information on the Trust as a whole.

On September 14, 1992, IFTI forwarded the 1991 annual report for N.L. Booth's account to John Booth. This report included another actuarial valuation signed by Deloitte & Touche. In order to accommodate the 1991 contribution, the accrual percentage for DWB's was increased to 6.54 percent.

In all, the annual reports for N.L. Booth's account in the Prime Plan included the following information:

| | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Fund value at yearend | $100,281 | $151,615 | $150,370 | $160,563 | $169,572 |
| Contribution in transit | - 0 - | 55,000 | - 0 - | - 0 - | - 0 - |
| Policy values | - 0 - | 96,219 | 149,983 | 160,176 | 169,181 |
| Surrender value | N/A | 90,412 | 141,438 | 151,632 | 160,636 |
| Additional contrib. available | 3,976 | 4,263 | 15,647 | 23,058 | 35,386 |
| Date of report | 08/12/91 | 09/14/92 | 02/23/94 | 12/08/94 | 01/16/96 |

### E. Forms 5500-C/R

Forms 5500-C/R for N.L. Booth's account in the Prime Plan included the following information:

| | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| Yearend assets | $100,282 | $145,808 | $141,825 | $152,019 |
| Income | 252 | 47,025 | 3,892 | 10,194 |
| Expenses | - 0 - | 1,499 | 7,875 | 1,215 |
| Contributions | 100,030 | 55,000 | - 0 - | - 0 - |

These forms did not list any insurance commissions paid from 1990 through 1993.

VII. Systems

A. Overview

The Johnsons are husband and wife, and they resided in Waco, Texas, when they petitioned the Court. Systems' principal place of business was in Waco, Texas, when it petitioned the Court. Since 1990, Systems' only employees have been the Johnsons and Robert J. Carr. Mr. Carr, a certified public accountant (C.P.A.), is Systems' controller.

Mr. Johnson initially owned 49 percent of Systems' common stock, and Mrs. Johnson owned the rest. On December 1, 1990, Systems canceled the shares of stock initially issued to the Johnsons and reissued 21 shares to Mr. Carr, 39 shares to Mr. Johnson, and 40 shares to Mrs. Johnson. On February 2, 1991, Mr. Johnson held 79 shares of Systems' stock through a partnership known as Chief Smokey, Ltd., and Mr. Carr owned the remaining shares.

Systems reported its operations for Federal income tax purposes on a fiscal year ending on September 30, and it used the cash method on its relevant tax returns. These returns included the following information:

| Taxable year ended | 09/30/90 | 09/30/91 | 09/30/92 | 09/30/93 |
|---|---|---|---|---|
| Total income | $51,643 | $725,000 | $606,132 | $909,028 |
| Compensation of officers | – 0 – | 303,200 | 102,200 | 143,000 |
| Salaries & wages | 20,481 | 1,000 | 1,000 | 7,855 |
| Pension, profit-sharing, plans | – 0 – | – 0 – | – 0 – | – 0 – |
| Employee benefit programs | – 0 – | 301,150 | 300,000 | 700,000 |
| Taxable income (loss) | (24,159) | 35,132 | 145,384 | 7,518 |

Of the reported compensation, Mr. Johnson received zero, $150,000, $142,500, $120,000, and $130,000 during his respective

taxable years from 1989 through 1993, and Ms. Johnson received zero, $9,000, $16,900, $15,500, and $13,000 during the same respective years.

Johnson Roofing, Inc. (Roofing) is an affiliate of Systems. Roofing's relevant tax returns included the following information:

| Taxable year ended | 10/31/89 | 10/31/90 | 10/31/91 | 10/31/92 |
|---|---|---|---|---|
| Total income | $1,865,045 | $1,939,495 | $1,582,097 | $1,893,945 |
| Compensation of officers | 233,988 | 300,600 | 10,200 | - 0 - |
| Salaries & wages | 50,495 | 429,644 | 535,298 | 603,235 |
| Pension, profit-sharing, plans | - 0 - | - 0 - | - 0 - | - 0 - |
| Employee benefit programs | 1,087 | - 0 - | - 0 - | - 0 - |
| Taxable income (loss) | 114,719 | 123,189 | (197,520) | (471,113) |

Of the reported compensation, Mr. Johnson received $73,000, $234,988, and $288,000 in his respective taxable years from 1988 through 1990. Ms. Johnson received $20,580, $31,200, and $15,600 during the same respective years. Neither of the Johnsons received any compensation from Roofing during their 1991 through 1993 taxable years.

The Johnsons filed timely their joint 1990 Federal income tax return. On March 3, 1994, the Commissioner mailed them a notice of deficiency reflecting a determination that the Johnsons' 1990 taxable income was increased by $297,299 on account of a taxable transfer of property from Systems under section 83.[12] The notice also stated that the Johnsons were liable for a $16,794 accuracy-related penalty under section

---

[12] The notice also increased the Johnsons' 1990 income by $184,099 on account of "Agreed Items".

6662(a) because the underpayment of tax attributable to section 83 was due to negligence.

On the same day, the Commissioner mailed Systems a notice of deficiency reflecting a determination that its 1990 taxable income was increased by $300,000 because its contribution to the Trust was governed by subpart D.  Systems filed timely its 1990 tax return.  The notice also stated that Systems was liable for a $21,735 accuracy-related penalty under section 6662(a) because its underpayment of income tax was due to a substantial understatement.

### B.  Systems' Introduction to the Prime Plan

Max Chapman, Systems' independent C.P.A., introduced the Johnsons to the Prime Plan, stating that it would be "useful in tax planning".  Mr. Carr was also involved in meetings concerning Systems' decision to join the Prime Plan, and he reviewed some of the plan's literature.  One of the main selling features of the Prime Plan from Mr. Carr's perspective was the "very thick opinion letter".  Mr. Johnson, individually and on behalf of Systems, relied upon competent and informed tax and investment advisers before joining the Prime Plan and in reporting the tax ramifications that flowed therefrom.

### C.  Systems' Adoption of the Prime Plan

Systems joined the Prime Plan by executing an Adoption Agreement dated and effective as of December 20, 1990, and by making a $300,000 contribution to the Trust 6 days later.  The

contribution funded the full accrual of DWB's for Systems' three employees ($264,000), as well as their death benefits ($36,000). When Mr. Johnson made that contribution, he believed the money could not be lost to an employee of another Employee Group. Systems' three employees became Systems' Covered Employees in 1990.

On March 12, 1991, Mr. Johnson, on behalf of Systems, amended the 1990 Adoption Agreement effective as of December 31, 1990, to change the DWB accrual percentage to 176 percent and the years of service multiple to one.  No change was made to the vesting schedule.

In all, Systems submitted the following Adoption Agreements relating to its participation in the Prime Plan:

| Date Effective | 12/20/90 | 12/20/90 | 12/20/90 | 12/20/90 |
|---|---|---|---|---|
| Dismissal wage benefit percentage | 176 | 176 | 176 | 200 |
| Years of service | 1 | 1 | 1 | 5 |
| Vesting schedule | Immediate | Immediate | Immediate | 4/40 |
| Normal retirement age not listed | 65 | 65 | Not listed | 65 |
| Death benefit multiple | 16.275 | 16.275 | 16.275 | 15.695 |
| Date executed | Not executed | Not executed | Not dated | 12/20/90 |

On December 2, 1991, IFTI sent Systems copies of substitute pages 1 and 5 for its Adoption Agreement.  These pages changed the employer yearend to September 30, the Normal Retirement Date to 65, and the death benefit multiple to 16.275.

D.  Administration of Systems' Account in the Prime Plan

The 1989 annual report on Systems' account in the Prime Plan pertained only to Systems' Employee Group, and it did not provide any information regarding the Trust as a whole.

On March 6, 1991, IFTI forwarded the 1990 annual report for Systems' account to Mr. Johnson.  The report included an actuarial valuation signed by Deloitte & Touche and provided the following calculations of vested severance benefits for Systems' Covered Employees:

|  | 1989 Compensation | Accrual percent | Years of Service | Vesting percent | Vested Severance |
|---|---|---|---|---|---|
| Mr. Johnson | $140,000 | 176 | 1 | 100 | $246,400 |
| Ms. Johnson | 9,000 | 176 | 1 | 100 | 15,840 |
| Mr. Carr | 1,000 | 176 | 1 | 100 | 1,760 |

In the 1990 annual report, the Prime Plan's actuary used a DWB of 176 percent, 1 year of service, 100 percent vesting, and a 16.275 death benefit multiple.  These numbers were different from those set forth in the Adoption Agreements.  Adoption Agreements with the percentages and multiples used in the 1990 annual report were prepared, but never executed by Systems.  IFTI contacted Systems on numerous occasions in 1991 and 1992, stating that Systems needed to provide the executed Adoption Agreements.  Mr. Carr executed, but failed to date, an Adoption Agreement with the correct percentages and multiples.

The annual reports for Systems' account in the Prime Plan included the following information:

| | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Fund value at yearend | $300,000 | $304,342 | $317,443 | $326,944 | $338,487 |
| Policy values | – 0 – | 303,424 | 316,513 | 327,064 | 338,607 |
| Surrender value | N/A | 240,440 | 255,413 | 269,293 | 283,222 |
| Additional contribution available | – 0 – | 17,312 | 29,863 | 44,164 | 57,460 |
| Date of report | 3/06/91 | 11/16/92 | 2/23/94 | 8/15/94 | 6/28/95 |

### E.  Forms 5500-C/R

Forms 5500-C/R filed with the Commissioner on Systems' account in the Prime Plan reported the following information:

| | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Yearend Assets | $300,081 | $241,358 | $256,343 | $269,173 | $283,102 |
| Income | 81 | 21,588 | 26,324 | 26,091 | 24,134 |
| Expenses | – 0 – | 80,311 | 11,339 | 13,261 | 10,205 |
| Contributions | 300,000 | – 0 – | – 0 – | – 0 – | – 0 – |

These forms also reported the payment of zero, $38,546, zero, zero, and zero in insurance commissions during the respective years.

## VIII.  On-Site Project Management, Inc. (On-Site)

### A.  Overview

The Traegdes are husband and wife, and they resided in Tempe, Arizona, when they petitioned the Court.  On-Site is an S corporation that was incorporated on July 2, 1984.  Mr. Traegde was its president, and he owned 98.4022 percent of its stock on December 31, 1989.  Ms. Traegde was On-Site's vice president, and she owned the rest of its stock on that date.  The 1989 Federal income tax returns of On-Site and the Traegdes were filed timely.

On-Site reported its operations for Federal income tax purposes on a calendar year, and it used the cash method on its relevant tax returns.  These returns included the following data:

|  | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|
| Total income | $1,130,895 | $1,108,792 | $923,488 | $114,270 | $603,522 |
| Compensation of officers | 120,910 | 213,985 | 219,621 | 71,011 | 135,519 |
| Salaries & wages | 234,900 | 387,389 | 122,142 | 135,724 | 86,660 |
| Pension, profit-sharing, plans | 104,296 | 47,300 | 1,585 | - 0 - | - 0 - |
| Employee benefit programs | - 0 - | - 0 - | - 0 - | 1,711 | 4,116 |
| Ordinary income (loss) | 471,158 | 232,440 | 371,926 | (230,453) | 213,508 |

Of the reported compensation, Mr. Traegde received $117,536, $201,956, $205,870, $56,808, and $125,207 during the respective years.

B.  On-Site's Introduction to the Prime Plan

Thomas J. Connelly was the Prime Plan's sales agent for On-Site.  Mr. Connelly introduced Mr. Traegde to the Prime Plan in late 1988.  Mr. Connelly had observed that Mr. Traegde did not have a succession plan for his business or any estate planning, that the Prime Plan offered death benefits for Mr. Traegde, and that the Prime Plan would give Mr. Traegde a source of funds to close his business when he decided to leave.

On October 4, 1988, Mr. Connelly wrote to On-Site's C.P.A., Thomas P. Joynt, explaining the Prime Plan.  On November 7, 1988, Mr. Joynt replied with certain questions about the Prime Plan, as well as On-Site's possible participation therein.  On November 17, 1988, Mr. Connelly responded to Mr. Joynt's letter.

Mr. Connelly discussed the Prime Plan with Mr. Traegde. Based on these conversations, and after reading the promotional

literature on Prime, Mr. Traegde concluded that the risks involved in the Prime Plan were minimal.  Mr. Traegde expected to get his DWB if he sold or closed his business, and he knew that he could withdraw On-Site from the Prime Plan at any time. Mr. Traegde also discussed Mr. Weiss' opinion letter on the Prime Plan with Mr. Joynt, and Mr. Traegde relied on Mr. Joynt's advice with respect thereto.

### C.  On-Site's Adoption of the Prime Trust

On-Site joined the Prime Plan by executing an Adoption Agreement on December 28, 1988, effective as of December 31, 1988, and by contributing $100,026 to the Trust on the same day. On-Site's contribution was applied primarily as follows: $89,645 to the full accrual of DWB's for its Covered Employees and $10,340 to the cost of their death benefits.  As of December 31, 1988, On-Site's Covered Employees were Mr. Traegde and four other employees.  Other On-Site employees became Covered Employees during 1989, and still others became Covered Employees in subsequent years.  On December 29, 1989, On-Site made an additional contribution of $50,030 to the Prime Plan.  On-Site made no contributions to the Prime Plan in 1990, 1991, or 1992.

On-Site submitted the following Adoption Agreements relating to its participation in the Prime Plan:

| Date effective | 12/31/88 | 12/31/88 | 11/01/89 | 12/31/89 |
|---|---|---|---|---|
| DWB percentage | 25.07 | 25.54 | N/A | 23.82 |
| Years of service | 7 | 7 | N/A | 8 |
| Vesting schedule | 4/40 | 4/40 | N/A | 4/40 |
| Normal retirement date | Same as 401(a) | Same as 401(a) | Same as 401(a) | Same as 401(a) |
| Death benefit multiple | 5.36 | 5.36 | 2.86 | 2.231 |
| Date executed | 12/28/88 | 12/28/88 | 11/01/89 | 12/28/89 |

| Date effective | 09/04/90 | 12/31/88 | 01/01/89 |
|---|---|---|---|
| DWB percentage | 24 | 25.54 | 27.220 |
| Years of service | 8 | 7 | 7 |
| Vesting schedule | N/A | 4/40 | 4/40 |
| Normal retirement date | Same as 401(a) | Same as 401(a) | Same as 401(a) |
| Death benefit multiple | N/A | 2.86 | 2.86 |
| Date executed | 10/18/90 | 02/11/92 | 02/11/92 |

On-Site's agreement dated November 1, 1989, also reduced the minimum death benefit from $50,000 to $25,000.

### D.  Administration of On-Site's Account in the Prime Plan

On August 15, 1989, Prime forwarded to On-Site a 1988 actuarial valuation for On-Site's account in the Prime Plan, signed by Laventhol & Horwath.  On March 11, 1991, IFTI forwarded a 1988 annual report for On-Site's account in the Prime Plan to Mr. Traegde.  This report included an actuarial valuation signed by Deloitte & Touche and provided the following calculations of vested severance benefits for On-Site's Covered Employees:

| Employee | 1987 Compensation | Accrual percent | Years of Service | Vesting percent | Vested Severance |
|---|---|---|---|---|---|
| Mr. Traegde | $156,000 | 25.54 | 5 | 45 | $89,645 |
| Larry French | 36,400 | 25.54 | 1 | - 0 - | - 0 - |
| Erik Kallstrom | 35,984 | 25.54 | 1 | - 0 - | - 0 - |
| Jeanne Sharon | 21,840 | 25.54 | 1 | - 0 - | - 0 - |
| Norman Burke | - 0 - | 25.54 | N/A | N/A | N/A |
| Richard Murphy | - 0 - | 25.54 | N/A | N/A | N/A |
| Michael Brandt | - 0 - | 25.54 | N/A | N/A | N/A |
| K. Diane Small | - 0 - | 25.54 | N/A | N/A | N/A |
| Denise Minix | - 0 - | 25.54 | N/A | N/A | N/A |
| Steve Boyles | - 0 - | 25.54 | N/A | N/A | N/A |

The 1988 report did not refer to another participating Employee Group, and it did not provide any information on the Trust as a whole.  The report related only to the On-Site's Employee Group.

On March 11, 1991, IFTI forwarded the 1989 annual report for On-Site's account in the Prime Plan to Mr. Traegde. This report included an actuarial valuation signed by Deloitte & Touche, and it listed nine other employees of On-Site, none of whom qualified for a 1989 vested severance benefit. In order to accommodate On-Site's 1989 contribution, the accrual percentage for DWB's was increased from 25.54 percent to 27.220 percent. The 1989 report acknowledged a $50,000 contribution from On-Site, and applied the $50,000 amount to the increase in DWB's allowed because of the change in the accrual percentage, the increase due to the increased vesting of Mr. Traegde, and the increase due to the cost of death benefits.

The annual reports for On-Site's account in the Prime Plan listed the following relevant data:

|  | 1988 | 1989 | 1990 | 1991 | |
|---|---|---|---|---|---|
| Fund value at yearend | $99,996 | $138,653 | $158,161 | $167,047 | |
| Policy values | 99,996 | 138,653 | 157,814 | 167,055 | |
| Surrender value | Unstated | Unstated | 136,959 | 147,056 | |
| Addit. contr. available | (11) | 2 | 61,519 | 128,443 | |
| Date of report | 03/11/91 | 03/11/91 | 07/10/91 | 01/20/93 | |

|  | 1992 | 1992 | 1993 | 1993 | 1994 |
|---|---|---|---|---|---|
| Fund value at yearend | $177,095 | $177,095 | $184,012 | $176,364 | $148,625 |
| Policy values | 177,103 | 177,103 | 186,612 | 178,964 | 177,545 |
| Surrender value | 157,104 | 157,104 | 166,613 | 161,097 | 162,772 |
| Addit. contr. available | 202,263 | 197,155 | 248,761 | 243,663 | 296,318 |
| Date of report | 09/94 | 03/95 | 09/94 | 03/95;10/95 | 10/95 |

On March 31, 1989, Prime forwarded to On-Site its 1988 summary plan description. On April 4, 1990, Prime forwarded to On-Site its 1989 summary plan description. On February 24, 1993, Prime forwarded to On-Site its summary plan description with amendments through January 1992.

E.  Forms 5500-C/R

Forms 5500-C/R filed with the Commissioner on On-Site's account in the Prime Plan included the following information:

|                | 1989      | 1990      | 1991      | 1992      | 1993      |
|----------------|-----------|-----------|-----------|-----------|-----------|
| Yearend assets | $138,653  | $137,306  | $147,048  | $157,095  | $164,013  |
| Income         | 38,867    | 14,163    | 13,054    | 13,087    | 12,434    |
| Expenses       | 241       | 15,510    | 3,312     | 3,076     | 5,516     |
| Contributions  | 50,030    | - 0 -     | - 0 -     | - 0 -     | 670       |

These forms also reported the payment of $11,858, $13,797, $54, zero, and zero in insurance commissions during the respective years.

## OPINION

We must determine the tax consequences flowing from the Prime Plan, a purported multiple employer welfare benefit plan that has been marketed nationwide by its promoters as a viable tax planning device and subscribed to by hundreds of entities whose employee/owners have sought primarily the promised tax benefits.  The designers of the Prime Plan struggled to comply with section 419A(f)(6)'s exception to the applicability of subpart D.  The designers followed the evolution of subpart D through the Congressional committees, and they aspired to create a valid welfare benefit plan that met the legislative intent for section 419A(f)(6).  The designers were familiar with the tax and labor provisions of employee benefit law.

Based on their understanding of the genesis of subpart D, the drafters concluded that section 419A(f)(6) covered their

design for the Prime Plan. One of the designers, Mr. Weiss, requested a ruling from the Commissioner that the Prime Plan qualified under section 419A(f)(6). The Commissioner did not issue a ruling in reply to Mr. Weiss' ruling request, and, to date, the Commissioner has not issued regulations construing section 419A(f)(6). On May 1, 1995, the Commissioner released Notice 95-34 (the Notice), 1995-1 C.B. 309, to provide guidance on "the significant tax problems" raised by certain trust agreements being promoted as multiple employer welfare benefit funds exempt from the limits of sections 419 and 419A. Id. Although the Notice did not mention the Prime Plan by name, the Notice indicated that the Commissioner disagreed with Prime that its plan was within section 419A(f)(6).

Having failed in their attempt to receive the Commissioner's assurance that the Prime Plan was a 10 or more employer plan under section 419A(f)(6), Prime nevertheless began marketing the plan in 1988, relying on the designers' opinions as to the validity of the promised tax benefits that Prime believed flowed from the Prime Plan. The Commissioner now challenges these tax benefits in the instant litigation. The Commissioner argues primarily that the Prime Plan is a plan of deferred compensation. Petitioners argue that the Prime Plan provides merely welfare benefits. The Commissioner argues alternatively that the Prime Plan is actually an aggregation of plans that is outside the scope of section 419A(f)(6). Petitioners argue that the Prime

Plan is a single 10 or more employer plan within section 419A(f)(6).

We must resolve these disputes. We do so with the benefit of a comprehensive and detailed evidentiary record developed by the parties up to, including, and after trial, as well as with the aid of the parties' briefs and other voluminous submissions that have focused on issues which have been in dispute at one time or another throughout this proceeding. We analyze the law that applies to the issues at hand, giving due regard to all arguments made by the parties with respect to these issues.

1.  Type of Plan:  Welfare Benefit or Deferred Compensation

We pass first on whether the Prime Plan is a plan of welfare benefit or deferred compensation. If the Prime Plan is a deferred compensation plan, section 404(a)(5) prohibits a participating employer from deducting a contribution until the year in which an amount attributable to the contribution is includable in the gross income of employees participating in the plan, assuming that separate accounts are maintained for each employee. If a separate account is not maintained for each employee, section 404(a)(5) does not allow an employer to deduct the contribution even in the year in which an attributable amount is included in the gross income of an employee. See also sec. 1.404(a)-12(b)(3), Income Tax Regs. If, on the other hand, the Prime Plan is a welfare benefit plan, subpart D generally limits the employer's deduction for its contributions to the amount that

would have been deductible had it provided the benefits directly to its employees. Subpart D's limitations are inapplicable when section 419A(f)(6) applies. Section 419A(f)(6) generally lets an employer fully deduct its contributions in the year made, although its employees may not have to report these contributions as income until a later year.

We agree with petitioners that the Prime Plan was a welfare benefit fund. See sec. 419(e)(1), (2)(B), (3)(B); sec. 1.162-10, Income Tax Regs; see also Schneider v. Commissioner, T.C. Memo. 1992-24; Moser v. Commissioner, T.C. Memo. 1989-142, affd. on other grounds 914 F.2d 1040 (8th Cir. 1990). Mr. Weiss testified credibly that he designed the Prime Plan intending entirely to provide employees with "real" welfare benefits that would not be subject to abuse, and we read the record to support his testimony. The DWB's under the Trust Agreement also are not payable upon the happening of a certainty, but more closely resemble insurance payable only in the case of an uncertainty. See Harry A. Wellons, Jr., M.D., S.C. v. Commissioner, 31 F.3d 569 (7th Cir. 1994), affg. T.C. Memo. 1992-704. Although the Prime Plan had features of deferred compensation (e.g., the payment of DWB's upon an employee's termination from employment based on his or her compensation and length of service, the presence of vesting schedules), these features were swallowed up by the Prime Plan's valid welfare benefit purpose so as to make

the deferred compensation features incidental and meaningless for purposes of our analysis.

Respondent argues that this Court's jurisprudence provides that the DWB's were deferred compensation, citing mainly Grant-Jacoby, Inc. v. Commissioner, 73 T.C. 700 (1980); New York Seven-Up Bottling Co. v. Commissioner, 50 T.C. 391, 398 (1968); New York Post Corp. v. Commissioner, 40 T.C. 882, 888 (1963); and Harry A. Wellons, Jr., M.D., S.C. v. Commissioner, T.C. Memo. 1992-704. We disagree. The plan at issue in each of the cases cited by respondent is distinguishable from the Prime Plan. Such is also true with respect to the benefits provided under each plan.

Nor do we agree with respondent's reading of the Seventh Circuit's opinion in Harry A. Wellons, Jr., M.D., S.C. v. Commissioner, 31 F.3d 569 (7th Cir. 1994), to provide that the DWB's were deferred compensation because the Prime Plan had some indicia of a deferred compensation plan. All welfare benefit plans bear some element of deferred compensation, see Wheeler v. United States, 768 F.2d 1333, 1336 (Fed. Cir. 1985); Greensboro Pathology Associates, P.A. v. United States, 698 F.2d 1196, 1200 (Fed. Cir. 1982), and respondent's reading of the Seventh Circuit's opinion emasculates the right of a taxpayer to avail itself of the tax attributes of a welfare benefit plan. Unlike the Prime Plan, the plan at issue in Wellons was "more akin to a deferred compensation plan than the sort of 'welfare benefits'

arrangement contemplated by the regulations". Harry A. Wellons, Jr. M.D., S.C. v. Commissioner, 31 F.3d at 572.

Nor do we agree with respondent's claim that the DWB's were deferred compensation because an employer could voluntarily terminate its participation in the Prime Plan. We are unable to find any requirement in the applicable statutory and regulatory provisions that would limit welfare benefits to cases in which an employer could not voluntarily terminate its participation in a plan. We find in the statutory text that the Congress knew how to say "involuntary separation" when it wanted. See, e.g., sec. 501(c)(17)(D), which is referenced in sec. 419A(f)(1)(A). In the absence of a legislative pronouncement that limits severance benefits to cases where an employer could not voluntarily terminate its participation in a plan, we refuse to adopt such a pronouncement here. Although respondent is concerned that the ability of a participating employer to terminate voluntarily its participation in the Prime Plan allows the employer to control the timing of income to its employees, we regard that concern as misplaced. Respondent's concern could also be expressed with respect to the pension plan of a corporation owned by a single shareholder. Although the shareholder may be the only employee, it does not necessarily follow that such a pension plan provides for receipt of deferred compensation merely because the owner/shareholder has the ability to terminate the pension plan at will.

We hold for petitioners on this issue.

## 2.  10 or More Employer Plan; Experience-Rating Agreements

We turn to the second issue; namely, whether the Prime Plan is a "10 or more employer plan" that lacks "experience-rating arrangements with respect to individual employers."  See sec. 419A(f)(6).  Petitioners assert that the Prime Plan is within section 419A(f)(6); i.e., the Prime Plan is a single plan that covers more than 10 employers, no one of which made more than 10 percent of the Trust's total contributions, and the plan has no experience-rating arrangements with respect to individual employers.  Respondent asserts that the Prime Plan is outside the scope of section 419A(f)(6); i.e., the Prime Plan is an aggregation of plans that has experience-rating arrangements with respect to all participating employers.

We agree with respondent that the Prime Plan does not meet the requirements of section 419A(f)(6).  The Prime Plan is an aggregation of separate welfare benefit plans, each of which has an experience-rating arrangement with the contributing employer. We start our analysis with a discussion of the history of subpart D.[13]  Subpart D, which consists of sections 419 and 419A, was enacted by the Congress as part of Deficit Reduction Act of 1984, Pub. L. 98-369, secs. 511(a) and 512(a), 98 Stat. 484, 854-862.

---

[13] In National Presto Indus., Inc. v. Commissioner, 104 T.C. 559 (1995), and General Signal Corp. v. Commissioner, 103 T.C. 216 (1994), supplemented by 104 T.C. 248 (1995), this Court addressed other issues under subpart D.

Subpart D limits an employer's deduction for contributions to a welfare benefit plan. The Congress enacted subpart D because it was concerned with the law under which employers received current deductions for contributions to welfare benefit plans, while the benefiting employees excluded these amounts from their current income. As stated by the House Ways and Means Committee, in proposing a change to the prior law,

> The committee has concluded that the favorable tax treatment of employer contributions to welfare benefit plans, as compared with employer payments of wages and salary, is inappropriate in view of the favorable tax treatment already provided to employees, i.e., the exclusion of many of these benefits from adjusted gross income. In addition, the committee believes that the current rules under which employers may take deductions for plan contributions far in advance of when the benefits are paid allows excessive tax-free accumulation of funds.

> The committee's concern has been caused by recent discussion among tax practitioners as to the tax-shelter potential of welfare benefit plans. Commentators have pointed out that the combination of advance deductions for contributions and the availability of tax exemption for certain employee benefit organizations (such as the voluntary employees' beneficiary association or VEBA) provides tax treatment very similar to that provided to qualified pension plans, but with far fewer restrictions. * * *

> In one article on the use of employee benefit plans as a tax shelter, an example is given of how a small professional corporation may utilize the tax benefits of a severance pay plan funded by a VEBA. In this example, the employees of the corporation are two doctors, ages 50 and 55, with annual salaries of $150,000 and $200,000, respectively, and three other workers, ages 20 to 36, with annual salaries of $10,000 to $18,000. The example indicates that the corporation could make tax deductible annual contributions to a tax-exempt VEBA of more than $55,000 annually under terms that would make it unlikely that the three lower-

paid employees would receive substantial benefits from the plan. * * *

Thus, the committee is concerned that substantial advance funding of welfare benefits will ultimately lead to an unacceptable tax burden for many taxpayers who do not participate in these programs. * * * [H. Rept. 98-432 (Part 2), at 1275-1276 (1984).]

As reflected in the report of the conference, the Congress enacted subpart D with the understanding that subpart D's principal purpose was "to prevent employers from taking premature deductions, for expenses that have not yet been incurred, by interposing an intermediary organization which holds assets which are used to provide benefits to the employees of the employer." H. Conf. Rept. 98-861, at 1155 (1984); 1984-3 C.B. (Vol. 2) 1, 409. The conference report states that

"While in many cases welfare benefit funds are designed to function in a manner similar to insurance arrangements, the conference [was] concerned that there [were] no clear standards of limitations applicable to such funds that [prevented] their utilization for substantial nonqualified deferred compensation funding outside the general pension plan funding, accrual and vesting rules." [Id. at 1155.]

The conference report commented as follows on the meaning of the term "funds":

a retired life reserve or premium stabilization account ordinarily is to be considered a fund or part of a fund, since such an account is maintained for an individual employer and that employer has a determinable right to have the amount in such an account applied against that employer's future costs of benefit claims or insurance premiums. A similar situation exists with respect to premium arrangements, under which an employer may, in some cases, pay an insurance company more in a year than the benefit costs incurred in that year and the employer has an

unconditional right in a later year to a refund or credit of the excess of payments over benefit costs. In contrast, an ordinary disability income policy under which an employer pays a premium so that employees who become disabled in that year may collect benefit payments for the duration of disability is not a fund, since the employer has no right to recover any part of the premium payment and the future benefit payments to an employee whose disability occurs during the period for which the premium is paid is not contingent on any further payments by the employer. * * * [Id. at 1155.]

The rules of subpart D, however, do not apply to a multiemployer plan described in section 419A(f)(6). Section 419A(f)(6) provides:

> (6) Exception for 10-or-More Employer Plans.--
>
>     (A) In general.--This subpart shall not apply in the case of any welfare benefit fund which is part of a 10 or more employer plan. The preceding sentence shall not apply to any plan which maintains experience-rating arrangements with respect to individual employers.
>
>     (B) 10 or more employer plan.--For purposes of subparagraph (A), the term "10 or more employer plan" means a plan--
>
>         (i) to which more than 1 employer contributes, and
>
>         (ii) to which no employer normally contributes more than 10 percent of the total contributions contributed under the plan by all employers.

According to the conferees, this exception was prescribed "because under such a plan, the relationship of a participating employer to the plan often is similar to the relationship of an

insured to an insurer."  H. Conf. Rept. 98-861, at 1159; 1984-3

C.B. (Vol. 2) at 413.  The conferees went on to explain that:

> "notwithstanding compliance with the 10-percent rule,
> and consistent with the discussion above on definition
> of a fund, a plan is not exempt from the deduction
> limits if the liability of any employer who maintains
> the plan is determined on the basis of experience
> rating because the employer's interest with respect to
> such a plan is more similar to the relationship of an
> employer to a fund than an insured to an insurer."
> [Id. at 1159.]

Petitioners argue that the Prime Plan is within this

exception, and that any uncertainty should be resolved in their

favor because respondent has not issued proper guidance under

section 419A(f)(6).  Petitioners assert that Mr. Weiss asked the

Commissioner for a ruling on the Prime Plan, and that the

Commissioner refused to accommodate him.  Petitioners assert that

Mr. Weiss was forced to withdraw his request for ruling 18 months

after he submitted it because he was led to believe that the

Commissioner would never rule on his request.  We understand

petitioners to argue that the Commissioner should have issued

Mr. Weiss guidance under section 419A(f)(6), and that the

Commissioner should now be penalized for failing to do so.

Petitioners rely on Gould v. Gould, 245 U.S. 151, 153 (1917), for

the proposition that any doubts as to the reach of section

419A(f)(6) must be resolved in their favor.

We do not agree with petitioners that any ambiguity is to be

resolved in their favor.  See Helvering v. Stockholms Enskilda

Bank, 293 U.S. 84, 93 (1934).  Subsequent to the Gould case, the Supreme Court stated as follows:

> We are not impressed by the argument that, as the question here decided is doubtful, all doubts should be resolved in favor of the taxpayer.  It is the function and duty of courts to resolve doubts.  We know of no reason why that function should be abdicated in a tax case more than in any other. * * * [White v. United States, 305 U.S. 281, 292 (1938).]

See United States v. Stewart, 311 U.S. 60, 71 (1940) ("those who seek an exemption from a tax must rest it on more than a doubt or ambiguity.  Exemptions from taxation cannot rest upon mere implications. * * * Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced"; (citations and internal quotation marks omitted)).

Section 419A(f)(6) may be interpreted in light of all pertinent evidence, textual and contextual, as to its meaning. See Commissioner v. Soliman, 506 U.S. 168, 173 (1993); Crane v. Commissioner, 331 U.S. 1, 6 (1947); Old Colony R. Co. v. Commissioner, 284 U.S. 552, 560 (1932); see also Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 300 (1996).  A statute speaks for itself, and its legislative history will help us discern the meaning of the words therein when the words are "'inescapably ambiguous'".  Garcia v. United States, 469 U.S. 70, 76 n.3 (1984)(quoting Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395 (1951) (Jackson, J., concurring)); see also Ex parte Collett, 337 U.S. 55 (1949).  Legislative history will also help us to discern text, which is otherwise

unambiguous, when the text's plain meaning defeats the statute's stated purpose.  As observed recently by the Court of Appeals for the Ninth Circuit, the circuit in which an appeal of this case lies:

> We may not adopt a plain language interpretation of a statutory provision that directly undercuts the clear purpose of the statute.  In Brooks v. Donovan, 699 F.2d 1010 (9th Cir. 1983), we refused to adopt a plain language interpretation of a statute governing pension funds.  We reasoned that the "court must look beyond the express language of a statute where a literal interpretation 'would thwart the purpose of the overall statutory scheme or lead to an absurd or futile result.'"  Brooks, 699 F.2d at 1011 (quoting International Tel. & Tel. Corp. v. General Tel. & Elec. Corp., 518 F.2d 913, 917-918 (9th Cir. 1975)).  In reaching our conclusion, we followed the Supreme Court's approach in United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).  There the Court noted that "[w]hen [a given] meaning has led to absurd results * * * this Court has looked beyond the words to the purpose of the act.  Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole,' this Court has followed that purpose, rather than the literal words."  American Trucking Associations, 310 U.S. at 543. * * *  [Albertson's, Inc. v. Commissioner, 42 F.3d 537, 545 (9th Cir. 1994), affg. 95 T.C. 415 (1990).]

Accordingly, in interpreting section 419A(f)(6), we look to the statute as written by the legislators, and we consult the statute's legislative history to learn its intended purpose and to resolve ambiguity in the words used therein.  Landgraf v. USI Film Prods., 511 U.S. 244 (1994); Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).  Petitioners must prove that the Prime Plan falls within the scope of section

419A(f)(6), which, as they read it, removes the Prime Plan's participating employers from the bowels of subpart D. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); see also Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943). Deductions are strictly construed and allowed only when a "'clear provision'" allows for one. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992)(quoting New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934)); Deputy v. du Pont, 308 U.S. 488, 493 (1940).

Petitioners argue that the Prime Plan is a single plan. Petitioners assert that the word "plan" is construed broadly, and that the need for the Trust to have a single pool of funds would make the phrase "experience-rating arrangements with respect to individual employers" surplusage. Petitioners assert that the Congress enacted section 419A(f)(6) "to encourage small employers to provide on a tax-advantaged basis welfare benefits to their employees, who, generally speaking, had not received such benefits in the past." Petitioners assert that the Prime Plan satisfies Congressional intent.

Petitioners also argue that the Prime Plan lacked "experience-rating arrangements with respect to individual employers". Petitioners define the relevant phrase by reference to a footnote in the House committee report; the footnote indicates that the term "purely experience-rated" means "the employer is entitled to an automatic rebate if the amount paid

exceeds the benefit claims and is liable if the benefit claims exceed the amount paid".  H. Rept. 98-432 (Part 2), supra at 1280 n.18.  Petitioners also look to section 1851(a)(8)(B) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2860, which describes an experience-rated insurance policy to mean "the employer has a contractual right to a refund or dividend based solely upon the experience of such employer".  Petitioners assert that the conferees' use of the word "often" in their explanation of section 419A(f)(6) means that the Prime Plan did not have to function as a risk-distributing insurer in order to fall within that section.  Petitioners assert that the Suspense Account satisfied any risk shifting requirement inherent in section 419A(f)(6) because actuarial gains were pooled to supplement underfunded benefits of other employers.

We disagree with petitioners' assertion that the Prime Plan is a single plan for purposes of subpart D.  The Prime Plan is nothing more than an aggregation of individual, unique plans formed by separate employers who have:  (1) Delegated to a common administrator their (the employers') duties and responsibilities with respect to the respective plans that each employee/owner has tailored personally for his or her business and (2) contributed funds to a trust overseen by a common trustee that was required to disburse each employer's contributions, and earnings thereon, primarily for the benefit of the contributing employer's employees.  The fact that Prime structured the Prime Plan to have

one administrator, one Trust, and a Suspense Account with some commonality among all employers does not change the fact that each of the employers separately had the unbridled authority to select many of the relevant terms under which its employees would collect benefits from the Prime Plan, that no Employee Group had a right to any contributions, or earnings thereon, which had been made by the employer of another Employee Group, and that a severed employee could end up receiving less than his or her promised benefit, even though the Prime Plan, as a whole, had enough assets to compensate the employee for this shortage.

We reject petitioners' claim that the Prime Plan is a "10 or more employer plan" based on the language and Congressional purpose of subpart D and section 419A(f)(6). We interpret the word "plan" to mean that there must be a single pool of funds for use by the group as a whole (e.g., to pay the claims of all participants), and we interpret the phrase "10 or more employer plan" to mean that 10 or more employers must contribute to this single pool. We do not interpret the statutory language to include a program like the instant one where multiple employers have contributed funds to an independent party to hold in separate accounts until disbursed primarily for the benefit of the contributing employer's employees in accordance with unique terms established by that employer. We are unpersuaded that the word "plan", as it appears in section 419A(f)(6), is satisfied by Prime's attempt to aggregate multiple plans as a single plan.

In arguing that the Prime Plan is a unitary "plan" for 10 or more employers within the scope of section 419A(f)(6), petitioners rely on the following features:  (1) The Prime Plan had a common administrator, and the Trust had a single trustee, neither of whom was accountable to or controlled by any one participating employer; (2) participating employers irrevocably delegated to Prime the responsibility for a variety of administrative and other functions; (3) Prime exercised unreviewable authority over the calculation of employer contributions, as well as the determination of benefit distributions and forfeitures to the Suspense Account; (4) Prime was responsible for determining the amount of all disbursements from the Suspense Account in accordance with an objective formula set forth in the Trust Agreement; and (5) the Suspense Account served a limited common interest of all participating employers. We conclude, however, that the foregoing features are outweighed by the following features that point to the result that we reach today:  (1) Prime was required to maintain separate accounts and a separate accounting for each Employee Group; (2) the Trust Agreement limited an employee's right to benefits under the Prime Plan to the assets of his or her Employee Group; (3) an annual valuation was performed for each Employee Group's account, and an annual valuation has never been performed for the Trust as a whole; (4) the summary plan description required by section 102 of ERISA was prepared separately for each Employee Group; (5) the

arrangement and the adoption agreement signed by each employer were very similar to an arrangement and adoption agreement used by separate employers' establishing a separate plan under the terms of a master plan; (6) each employer selected its employees' level of benefits, vesting schedule, and minimum participation requirements, separate and apart from the selections made by the other employers; (7) each employer's contribution benefited primarily its employees, and not the employees of other employers; (8) the Trust Agreement provided rules under which an employee's benefits would be reduced in the event of a shortfall, and without subsidy from the Trust as a whole; and (9) the Prime Plan did not pool all claim risks within the Trust.

Petitioners' argument focuses mainly on the fact that a single trust serviced multiple employers.  Their argument ignores the fact that the account of each participating employer was kept separate from that of every other employer, and, most importantly, that an employer's contributions benefited primarily its own Employee Group.  The applicability of section 419A(f)(6) does not rest on whether more than nine employers contribute to a single trust.  Section 419A(f)(6) requires a single plan, the existence of which is not established by Prime's sponsorship of a program under which multiple employers contribute to a single trust.  But for the fact that a single promoter formed a common trust and offered many employers the ability to enroll in a program that was administered by a common overseer, we find

little meaningful commonality among each participating employer's participation in the Prime Plan.

Contrary to petitioners' assertion, our interpretation of the term "10 or more employer plan" does not make surplusage of the phrase "experience-rating arrangements with respect to individual employers".  The phrase has meaning, for example, when a multiple employer trust maintains a single pool of assets from which all claims could be paid and charges each group of participants a different premium.  If one were to look solely at physicians and construction workers, two of the vocations of employees covered by the Prime Plan, and assume that the turnover rate of these two groups is different, the Prime Plan, if structured with a single pool of assets, would almost certainly have to charge different premiums to the different groups based on each group's turnover rate in order to lure them into and retain them in the plan.  In the context of the Prime Plan, however, a single pool was simply not desirable because prospective participating employers did not want to accept the risk that their contributions would be used to pay the severance claims of other employers' employee groups that possessed different levels of severance risk.

We find additional support for our interpretation in the testimony of Charles C. DeWeese, F.S.A., M.A.A.A., an expert on multiple employer plans, who concluded that each Employee Group was a separate plan.  Mr. DeWeese testified that the typical

multiple employer trust allows a participant to collect benefits from 100 percent of the trust's assets, and petitioners' expert, E. Paul Barnhart, F.S.A., M.A.A.A., did not disagree.[14] Mr. Barnhart testified that the attributes described by Mr. DeWeese were found typically in a multiple employer trust, and that, except for the Trust, he (Mr. Barnhart) had never seen a multiple employer trust that did not possess those attributes. Mr. DeWeese and Mr. Barnhart both testified that the Prime Plan was dissimilar to a traditional multiple employer plan, mainly because of its lack of these attributes.

We disagree with petitioners' reading of the legislative history to indicate that the Congress enacted section 419A(f)(6) to encourage plans such as the Prime Plan. We read this history to point to a legislative intent that is contrary to the intent espoused by petitioners. The House committee articulated its concern about the tax-shelter potential of welfare benefit plans and about the ability of small business owners to achieve the effect of a qualified pension plan, but with fewer limitations. H. Rept. 98-432 (Part 2), supra at 1275. The committee also noted that "substantial advance funding of welfare benefits will

---

[14] We were not impressed with the testimony of petitioners' other expert, Kenneth D. Klingler, F.S.A. We find his testimony at trial unpersuasive and unhelpful, and we do not rely on it. Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988), affg. in part and revg. in part on another issue T.C. Memo. 1986-318; Christ's Estate v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 301-302 (1996).

ultimately lead [inappropriately] to an unacceptable tax burden for many taxpayers who do not participate in these programs." Id. at 1276. Bearing these expressions of legislative intent in mind, we are unable to agree with petitioners that the Congress was encouraging the type of tax planning techniques promoted in the Prime Plan.

We also disagree with petitioners' assertion that the Prime Plan lacked "experience-rating arrangements with respect to individual employees". The legislative history of subpart D sets forth the House committee's intent to disallow the tax benefits which petitioners claim flow from the Prime Plan, and the examples of abuse that the House committee cited in its report describe precisely what Prime is attempting to accomplish through the Prime Plan. The legislative history states that section 419A(f)(6) was enacted because the relationship of a participating employer to a 10 or more employer plan typically resembles the relationship of an insured to an insurer. H. Conf. Rept. 98-861, supra at 1159; 1984-3 C.B. (Vol. 2) at 413. The legislative history states further that a 10 or more employer plan is outside the scope of section 419A(f)(6) if "the liability of any employer who maintains the plan is determined on the basis of experience rating because the employer's interest with respect to such a plan is more similar to the relationship of an employer to a fund than an insured to an insurer." H. Conf. Rept. 98-861, supra at 1159; 1984-3 C.B. (Vol. 2) at 413.

The term "experience-rated" means generally that premiums (contributions) are adjusted to reflect experience. See also United States v. American Bar Endowment, 477 U.S. 105, 107 (1986) ("experience rated * * * means that the cost of insurance to the group is based on that group's claims experience, rather than general actuarial tables"). The Congress knew this, as evidenced by the fact that the House committee defined the term "purely experience-rated" in its report. Yet, the Congress declined to inscribe the term "experience-rated" in section 419A(f)(6), choosing, instead, to use the term "experience-rating arrangements". We believe that the scope of the term "experience-rating arrangements" is wider than that of "experience-rated". The conferees stated that a plan is outside the scope of section 419A(f)(6) if any employer's liability "is determined on the basis of experience rating". If the conferees had meant to equate the term "experience-rating arrangements" with the term "experience rated", they could (and we believe would) have said that a plan is outside the scope of section 419A(f)(6) if any employer's liability "is experience rated". The conferees did not. Nor did the Congress provide in section 419A(f)(6)(A) that the first sentence therein "shall not apply to any plan * * * [that is experience rated] with respect to individual employers."

The essence of experience rating is the charging back of employee claims to the employer's account. The Prime Plan

accomplished the same result by adjusting the employees' benefits to equal its employer's contributions. The Prime Plan charged back the employees' claims to their employers' accounts by carrying the accounts' yearend balances over to future years and limiting an employee's benefits to the amount in his or her employer's account. This was an experience-rating arrangement. Mr. DeWeese concluded that experience-rating may occur by adjusting benefits, rather than premiums, and Mr. Barnhart agreed. Mr. Barnhart also acknowledged that the term "experience-rating" means that, over time, the premiums less expenses equal the benefits. This credible expert testimony supports our view that the Prime Plan had experience-rating arrangements with respect to all participating employers.

We also conclude that the Prime Plan had experience-rating arrangements because each employer's relationship to the Trust was more akin to the relationship of an employer to a fund, than of an insurer to an insured. In the typical setting of a self-funded welfare benefit plan, an employer contributes to a fund from which all of its employees' claims are paid; another employer's employees may not recover amounts from the first employer's fund. An insurer in the typical insurer/insured relationship, on the other hand, usually collects premiums from many employers and pays the claims of each of the employer's employees. The insurer typically spreads the risk of claims

among all employers by charging each employer a premium commensurate with its covered risk.

The relationship of the Trust to each participating employer more closely mirrored self-funding than insurance. As a matter of fact, the Trust Agreement provided that each employee's claim could be funded only from the account of the employee's employer, and that an employee did not have recourse against the employer, the Trust, or any other person, to the extent of any shortfall. It also is relevant that: (1) Prime accounted for each employer's account separately; (2) the Trust Agreement provided rules under which an employee's benefits would be reduced in the event of a shortfall; (3) the Trust held and invested an employer's contributions until benefits had to be paid to its employees; (4) the Prime Plan did not pool all claim risk within the Trust; and (5) an employer's contributions to the Trust could pay its employees' claims after the year's end, while an insurer will not return an insured's premiums to it at the end of the policy.

Petitioners argue that the Suspense Account provided the risk shifting necessary for the Prime Plan to qualify under section 419A(f)(6). We do not agree. Notwithstanding the reasons asserted by petitioners for the Suspense Account, the record shows clearly that the Suspense Account's primary purpose was to pay fees and expenses, and that only a de minimis amount of funds was actually disbursed from the Suspense Account to

satisfy employee claims.  The record also demonstrates that amounts were not transferred into the Suspense Account based on exposure to risk, and that the Suspense Account did not serve to spread among the participating employers the risk of incurring DWB's.

Even if one were to assume arguendo that the Suspense Account did serve to shift some risk, our view would not change. We are unable to find that any such shift would have been meaningful.  As a point of fact, the risk of severance never shifted from the employers to the Trust.[15]  The Trust never assumed any risk of loss for any amount placed therein. Contributions never provided a meaningful benefit to persons other than the contributing employer's employees.  Although it is true that actuarial gains were pooled in the Suspense Account to supplement underfunded benefits of other employers, we do not believe that this pooling technique shifted risk significantly. As a point of fact, less than 0.1 percent of the benefits came from the Suspense Account.

Accordingly, we hold that the Prime Plan is not within the requirements of section 419A(f)(6).  Thus, the participating

---

[15] In this regard, we disagree with Mr. Barnhart, who testified that he believed the Suspense Account operated to share the risk of severance among employers.  Relying on this belief, Mr. Barnhart concluded that the Suspense Account operated to make the Prime Plan a single plan.  Mr. Barnhart agreed, however, that, absent the shift of severance through the Suspense Account, the Prime Plan would be an aggregation of separate plans.

employers are subject to subpart D.  Under section 419, each
employer's deduction for its contribution to its separate plan is
limited to the plan's "qualified cost" for the year, less the
plan's after-tax income.  Sec. 419(a), (b), and (c); see also
National Presto Indus., Inc. v. Commissioner, 104 T.C. 559,
566-567 (1995).  An employer's qualified cost equals the
qualified direct cost for the taxable year, plus an addition to a
qualified asset account.  Sec. 419(c)(1).

Respondent has proffered to the Court calculations of each
corporation's qualified cost and allowable deduction with respect
to its plan.  These calculations show that Young & Young is
entitled to deduct $11 for 1989, and that no other corporation is
allowed a deduction with respect to its plan.  Petitioners do not
dispute the mechanics of respondent's calculations, and
petitioners have not supplied the Court with alternative
calculations of qualified cost.  Petitioners' position, which we
have rejected, is that the corporations can deduct their
contributions in full.

We have reviewed respondent's calculations, and we are
satisfied that they are correct.  Accordingly, we sustain
respondent's determination that the corporations are not allowed
any deduction for the subject years with respect to their

contributions to the Prime Plan, except for Young & Young which may deduct $11 for 1989.[16]

## 3. Penalties

Respondent determined that each corporate petitioner was liable for a penalty under section 6662(a) because it substantially understated its Federal income tax. See sec. 6662(b)(2). As relevant herein, section 6662(a) imposes an accuracy-related penalty equal to 20 percent of an underpayment that is due to a substantial understatement of income tax. In the case of a corporation, a substantial understatement exists if its income tax was understated by the greater of 10 percent of the tax required to be shown on the return or $10,000. Sec. 6662(d)(1)(A). For this purpose, tax is not understated to the extent that the treatment of an item is based on substantial authority or is adequately disclosed in the return or in a statement attached to the return. Sec. 6662(d)(2)(B).

Substantial authority exists when the weight of authority supporting the treatment of an item is substantial when compared to the weight of authority supporting contrary treatment. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. To determine whether substantial authority is present, all authorities which are

---

[16] Respondent determined, and petitioners do not dispute, that Young & Young was a qualified personal service corporation taxable at a single rate of 34 percent. See sec. 11(b)(2). Accordingly, Young & Young's $11 deduction reduces its deficiency by $4.

relevant to the tax treatment of an item, including those authorities pointing to a contrary result, are taken into account. Id. Examples of authority include statutory and regulatory provisions, legislative history, and administrative interpretations of the Commissioner. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs. Legal opinions are not authority. The authorities underlying a legal opinion, however, may give rise to substantial authority for the tax treatment of an item. Id.

We conclude that the corporate petitioners are not liable for the penalties in dispute. We have agreed with petitioners that the Prime Plan is not a plan of deferred compensation and whether the Prime Plan is within the scope of section 419A(f)(6) is a novel question. Although we decide the latter question in favor of respondent, we are persuaded that petitioners' position is supported by a well-reasoned construction of the relevant statutory provisions. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs. We decline to uphold respondent's determination of the penalties against the corporate petitioners in the circumstances herein.

_____

We have considered all arguments made by the parties for contrary holdings and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered for petitioners in docket Nos. 2544-94, 2546-94, 5755-94, 5893-94, and 9229-94; decision will be entered for respondent with respect to the deficiencies and for petitioners with respect to the penalties in docket Nos. 2545-94 and 9230-94; an appropriate decision for respondent will be entered in docket No. 5754-94 as to the deficiency and the addition to tax under section 6651(a)(1) and for petitioner with respect to the penalty.